737 F.Supp. 1070 (1990)
Sandra L. CALESHU, Plaintiff,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al., Defendants.
No. 86-0403 C (5).
United States District Court, E.D. Missouri, E.D.
March 30, 1990.
*1071 *1072 *1073 Juan J. Laureda, Laureda and Bosch, Philadelphia, Pa., José Muniz, New York City, for plaintiff.
Armstrong, Teasdale, Schafly, Davis & Dicus, Edwin L. Noel, John Warshawsky and Francine I. Katz, Mary Kickham, St. Louis, Mo., for Merrill Lynch, Pierce, Fenner & Smith.
Lashly, Baer & Hamel, Margaret M. Mooney, Jeffrey J. Lowe, St. Louis, Mo., for Borgognoni.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff initiated this seven-count complaint in 1986 against defendants August Borgognoni and Merrill Lynch. Plaintiff alleges in Counts I and II that defendant Merrill Lynch discriminated against her on account of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e-2(a), and retaliated against her due to her protests of defendant's unlawful discriminatory practices in violation of 42 U.S.C. Section 2000e-3(a). Plaintiff also alleged intentional infliction of emotional distress against Merrill Lynch (Count III); violation of the service letter statute by Merrill Lynch (Count IV); assault by defendant Borgognoni (Count V); battery by defendant Borgognoni (Count VI); intentional infliction of emotional distress *1074 against defendant Borgognoni (Count VII); and an overtime wage violation under the Fair Labor Standards Act against Merrill Lynch (Count VIII).
This Court granted summary judgment in favor of defendant Merrill Lynch and against plaintiff on Count III. The Court held that plaintiff's remedy on that count was under the Missouri Worker's Compensation Statute. Prior to the trial of plaintiff's state law claims against Borgognoni, plaintiff dismissed the assault claim. Plaintiff tried the battery claim and the emotional distress claim (Counts VI and VII) to a jury from June 24 to June 30, 1987. Plaintiff elected to submit only the emotional distress claim to the jury. The jury returned a verdict in favor of Borgognoni on that count. The Court then dismissed the count alleging battery. Before the trial against Borgognoni, plaintiff purportedly settled Count IV, a service letter claim, and Count VIII, an overtime wage claim.
Counts I and II were tried before this Court sitting without a jury from October 22 to November 3, 1988. The Court also heard testimony as to the purported settlement of Counts IV and VIII between plaintiff and Merrill Lynch. Defendant Merrill Lynch's motion to enforce the settlement is also currently before the Court. This Court, having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulation of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

I. FINDINGS OF FACT
Plaintiff Sandra Caleshu is a female citizen of the United States who resides within the Eastern District of Missouri. Defendant Merrill Lynch is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e(b). Defendant is a Delaware corporation with its principal place of business in New York City, New York, and also doing business in Clayton, Missouri, where it operates an office.
Merrill Lynch hired Caleshu on August 13, 1982 as a sales assistant in its Clayton office. Between August 1982 and July 1983 plaintiff worked principally as the secretary for Jerry Cronin, the then sales manager of defendant's Clayton office. Thus, on January 17, 1983, plaintiff's job description was officially changed to secretary. Her salary and pay grade remained the same, however, and her duties did not change appreciably from the date of her hire.
On July 1, 1983, Cronin left Merrill Lynch to work for competitor. Defendant did not immediately hire anyone to replace Cronin. Therefore, defendant assigned plaintiff to overload types of jobs for various account executives on a temporary basis. Hank Masten arrived at Merrill Lynch's Clayton office on September 6, 1983. Masten's position was that of administrative manager. His duties were to insure the firm's policy regarding compliance was adhered to and to handle customer complaints. He also had a part in the hiring, firing and training of sales assistants.
Caleshu worked as Masten's secretary from September 1983 to August 1984. Masten had an opportunity to observe Caleshu's work performance. He found her work to be poor. He believed she was not up to the standards set by Merrill Lynch for work performance. Although plaintiff was officially assigned to Masten, he gave much of his work to another secretary because he did not believe plaintiff was capable, and because she often failed to do the work he gave her. Over time he received an abundance of complaints from Merrill Lynch personnel against plaintiff.
Beginning in March or April 1984 plaintiff was assigned as a sales assistant for account executives Coombs, Dillingham, Bowers and Wyman. She was also assigned temporarily to account executives Pilkington and Compton. In May or June 1984 plaintiff was reassigned to account executives Casey, April, Levick and Surhoff. At this time, plaintiff's official title was changed back to a sales assistant from a secretary. Her grade within defendant's *1075 pay system, however, remained unchanged. The duty of a sales assistant is to provide support to the salesmen, such as answering phones, mailing correspondence, doing research and resolving problems that may arise with the clients. Sales assistants are also responsible for getting checks paid out and for inputting data into the computers. Basically, they perform the support functions for the salesmen.
While plaintiff was a sales assistant to the account executives, there were significant complaints to management about her work performance. Plaintiff was William Dillingham's sales assistant from April to July 1984. He maintained that Caleshu was slow, and that she failed to follow up on assignments. He also stated that she made numerous careless mistakes. For example, she consistently failed to include the proper documents in mailings to clients, and she sent out the wrong information to clients on more than one occasion. Dillingham stated she was one of the worst sales assistants he had seen. He complained to Hank Masten, the administrative manager, about plaintiff's poor work.
Douglas Coombs, another account executive, also had difficulties with plaintiff in Spring 1984. Coombs complained that plaintiff's work was not satisfactory and therefore he was afraid to give her work. She failed to follow up on assignments. She failed to cover the phones. He always had to double check plaintiff's work. He felt that although plaintiff had a good personal attitude, her work attitude was poor. Coombs maintains that in the six and one half years he had been an account executive, plaintiff was the worst sales assistant he had seen. When plaintiff was sales assistant to account executives Casey, April, Levick, Surhoff and Bowers, they also complained about plaintiff's work.
In the summer of 1984, Masten recommended to Mr. Sturgeon that they terminate plaintiff. Sturgeon was the resident vice-president at the Clayton office. At that time, however, Sturgeon was leaving the firm and a new vice-president was joining the firm. Sturgeon believed that the decision as to Caleshu should be left to the new vice-president. On August 1, 1984, Arthur DeStefano came to the Clayton office as the new resident vice president. He discussed the personnel situation with Masten. At that time they talked about the problems with Caleshu. DeStefano told Masten that although Masten had received numerous complaints from brokers and other sales assistants he did not want to fire plaintiff until he had an opportunity to observe plaintiff first hand, especially because there was a shortage of sales assistants.
In August 1984, roughly four days after DeStefano arrived, August Borgognoni moved to Merrill Lynch's Clayton office. He had previously been an account executive for Merrill Lynch in Fort Pierce, Florida. Upon arriving at Merrill Lynch, Borgognoni was placed in the office space next to plaintiff's cubicle. Initially, Borgognoni was an account executive in the Clayton office. Shortly after his arrival he also became a producing sales manager for the office. However, as sales manager he had no authority to hire, fire or discipline any sales assistant, including plaintiff. This authority was reserved to Arthur DeStefano. DeStefano would make such personnel decisions with advice from the office's administrative managers, Hank Masten and Richard Paradise.
When Borgognoni became a producing sales manager, management assigned plaintiff to him as his sales assistant/secretary. Masten and DeStefano had hoped this position change might help improve plaintiff's work efforts. She also continued to do some work for Masten. On September 6, 1984, three weeks after plaintiff began working for Borgognoni, she received a performance evaluation from him and from Masten. They gave her a favorable review, rating her well above average. Masten and DeStefano testified that under Merrill Lynch's corporate policy in existence at the time, in order to obtain a raise a sales assistant had to receive a well above average rating. Had Caleshu not received a high performance rating she could not have been given a raise. Although plaintiff's work was not good, Masten and DeStefano had hoped that a raise might improve *1076 Caleshu's performance by encouraging her to work harder and more diligently. Furthermore, Caleshu had not had a raise in twenty-two months. Last, an improvement in Caleshu's performance was needed because Merrill Lynch was experiencing a hiring freeze. Thus, they could not hire another sales assistant to do plaintiff's work or to replace her. Therefore, Masten chose to evaluate plaintiff so that she could receive a raise. The Court finds this testimony to be an accurate depiction of the circumstances surrounding plaintiff's favorable review and pay raise. As for Borgognoni, he gave plaintiff a favorable review simply because she had only been working for him for three weeks, and he was not yet familiar with her work.
By October 1984, Borgognoni had become aware of Caleshu's poor work performance. Specifically, he noted that plaintiff did not know how to use the computer system to generate checks. She did not send checks out as required. She recorded inaccurate clients' names and telephone numbers. She failed to answer the phone diligently. Borgognoni complained to Masten about plaintiff's work performance.
Plaintiff contends that shortly after Borgognoni's arrival he began asking her to lunch, and to date him socially. She went to lunch with him once. She claims from the time she began working for him, he subjected her to offensive and undesirable touching. Plaintiff complains of two incidents where Borgognoni forcibly french kissed plaintiff and two incidents where Borgognoni touched plaintiff's thigh without her consent. As to each of these incidents, plaintiff admits they occurred outside of defendant's offices. Furthermore, they were not witnessed by anyone in Merrill Lynch's management. Nor was plaintiff able to produce a single person who witnessed any event of kissing or offensive touching in the work environment. Caleshu also contends that Borgognoni asked her out on dates, and asked her for sexual favors, both of which she steadfastly refused. Again, there are no witnesses.
Plaintiff contends that Borgognoni told her two offensive and off-color jokes. At least one of the two jokes was told in front of Ms. Debbie Callen who testified that the joke was told after hours, and that she did not find the joke to be offensive.
Borgognoni apparently invited himself to dinner with plaintiff when she planned to have dinner with Mr. and Mrs. Callen (Mr. Callen was an account executive at Merrill Lynch). Even though plaintiff objected to his presence, Mr. Borgognoni still attended the dinner.
On October 10, 1984, Borgognoni required plaintiff to attend the Mutual Fund Coordinators Dinner. There was testimony that DeStefano also asked his secretary to the dinner, and that it was not unusual for Borgognoni to have asked plaintiff to attend with him. It was in the car afterwards when Borgognoni allegedly forced the first kiss upon plaintiff.
On one occasion Borgognoni called plaintiff and asked her to pick him up from the airport. She did so accompanied by the Callens. They went to Bristol's for dinner, and afterwards went to the South Hampshire Racquet Club for the purpose of having Borgognoni meet other people. Afterwards, plaintiff, the Callens and Borgognoni went to the Callens' home. Once there, he placed his hand upon plaintiff's thigh whereupon she promptly removed it. Both Mr. and Mrs. Callen witnessed this. After visiting the Callens, on the drive back to Merrill Lynch, Borgognoni kissed plaintiff the second time.
Borgognoni gave plaintiff both a greeting card and a china box for her birthday. Plaintiff contends that both the card and the box were offensive. The Court has examined them and finds neither the card nor the gift to be in the least bit offensive. Further, Lisa Kingman Bass, another sales assistant in the office, testified that she has received cash and other gifts from brokers, and that it was not unusual for the brokers to reward their sales assistants in that fashion.
Plaintiff maintains that Borgognoni would often show up at the "Exchange Bar" when plaintiff was there. Other testimony suggests that the bar was frequented often by numerous Merrill Lynch employees, *1077 and that it was not therefore unusual for Borgognoni to be there when Caleshu was.
The Court finds all of the above actions to have occurred. Plaintiff further claims, however, that on one occasion Borgognoni placed a $100.00 dollar bill in plaintiff's shirt pocket at a company Christmas gathering in the Clayton office, while simultaneously fondling her breast in front of co-workers. Additionally, he appeared in a racquet club where she was with the Callens, and while standing in front of her wearing shorts, he bent over and exposed his genitals in her presence. The Court finds this testimony to be inaccurate. Despite plaintiff's claim that these two events occurred in public, plaintiff was unable to present one person who could corroborate her stories, and the Court does not find these two events to actually have occurred.
All of plaintiff's complaints against Borgognoni were described by Caleshu in detail in her jury trial against Borgognoni for intentional infliction of emotional distress. The jury returned its verdict in favor of Borgognoni. The Court does not find, however, that this is an indication that the jury did not believe any of the alleged acts of harassment occurred. The Court believes that the jury probably found that some or most of these acts occurred, but rejected plaintiff's claim that the combined acts were substantial or significant enough to have caused plaintiff any emotional distress. The Court will consider the jury's finding in favor of Borgognoni in that light.
While these incidents were occurring between August 1984 and December 1984, plaintiff admits she did not complain to anyone in defendant's management about the improper behavior. Management never knew, nor had reason to know, of any of the alleged improprieties between Caleshu and Borgognoni.
Susan Malcolm testified that she began working for defendant as a sales assistant in January 1982. When Borgognoni arrived at the office, he asked Malcolm to drive him around town because he did not have a car, and was unfamiliar with the city. Malcolm acquiesced. She claims that Borgognoni put his hand on her knee on one occasion. He also attempted to kiss her on five to ten occasions. None of these acts occurred at the work place. Moreover, she never complained to DeStefano about Borgognoni's conduct.
Gail Merkel also testified for plaintiff. She worked as a sales assistant for Merrill Lynch from 1983 through 1985. Although Borgognoni never asked her out, nor attempted to touch or kiss her, Merkel still testified that Borgognoni offended her. Nonetheless, Merkel never said anything to management about Borgognoni.
Merrill Lynch had a policy regarding discrimination within the office. The policy entreated employees to report to management any acts of sexual harassment. The policy was enforced within the office and there was no evidence to indicate that the office did not so enforce it. Significantly, plaintiff had knowledge of this policy while working for Merrill Lynch. Nonetheless, plaintiff never brought Borgognoni's allegedly improper conduct to management's attention.
Plaintiff did not complain to anyone about Borgognoni until January 8, 1985, when she informed DeStefano about her problems. This occurred after plaintiff became aware that Borgognoni was dissatisfied with her work. Plaintiff only mentioned to DeStefano that Borgognoni was asking her out, which was bothering her. She made no mention of the alleged kissing or touching incidents, or any other problems she was having with Borgognoni.
DeStefano confronted Borgognoni with Caleshu's allegations. He told Borgognoni to stop whatever it was he was doing to irritate Caleshu. Plaintiff clearly admitted that as of early 1985, after she talked with DeStefano, she had no more problems with Borgognoni. He stopped asking her out. He did not attempt to kiss or touch her again. In fact, everything stopped altogether.
In early February 1985, however, plaintiff made a complaint to Paradise. Paradise took plaintiff to DeStefano. She told DeStefano that it was impossible for her to *1078 continue working for Borgognoni because he was treating her unfairly. Plaintiff was visibly upset and asked to be transferred away from him.
DeStefano, aware of the personality conflict between plaintiff and Borgognoni, transferred plaintiff across the office from Borgognoni and assigned her to a group of account executives on February 19, 1985. She admits she was as far away from Borgognoni as was physically possible. Furthermore, this was the same job plaintiff had before Borgognoni came to the office. Caleshu acknowledged that when she was reassigned, she remained a sales assistant with the same pay grade and salary. DeStefano reassigned plaintiff because she had requested a reassignment due to her personality conflict with Borgognoni, and because he wanted to rectify the problem plaintiff was apparently having with Borgognoni. His immediate concern was to remedy the problem before him.
Although plaintiff remained a sales assistant with the same salary and same salary grade level, plaintiff contended that this transfer constituted a demotion. She claims it was a less desirable location, and was riddled with problems which required plaintiff to do substantially more work for more account executives than she had been doing under Borgognoni. At the same time, however, she admits this is the same job she had before she began working for Borgognoni. The Court does not find that plaintiff's transfer across the office at her request was a demotion, especially because her pay, grade and duties were not affected in any way. Plaintiff filed a charge of discrimination against defendant Merrill Lynch with the United States Equal Employment Opportunity Commission (EEOC) on February 11, 1985.
After plaintiff's reassignment away from Borgognoni, several complaints were made concerning Caleshu's work performance and work habits. For example, Account Executive Doug Coombs submitted a written request on February 19, 1985 asking that he not receive Caleshu as a sales assistant. Coombs stated that Caleshu had been his sales assistant the previous spring and he believed the job was far beyond her capabilities. He believed that having Caleshu as his sales assistant again would be a major impediment to his business. He maintained that in the five years he had been an account executive, Caleshu was the worst sales assistant he had seen.
As another example, a secretary submitted a written note to Masten, as administrative manager, regarding plaintiff's absence from the office. Caleshu claimed she tried to contact the secretary about car problems. The note she left at the receptionist desk indicated Caleshu told the receptionist she had a doctor's appointment. Doctor's records established that she did not have an appointment on that date. Regardless of why plaintiff was gone, she had absented herself from work without a proper excuse, and without notifying the proper parties.
DeStefano and Paradise testified that on one occasion a confidential W-2 form of one of Borgognoni's clients was copied by Caleshu. She mistakenly sent the copied form to everyone in the office.
Finally, Account Executive Dominic Tsui complained to Masten that Caleshu had sent a letter addressed to a person in bookkeeping at Merrill Lynch by regular mail instead of internal mail. The letter was returned for insufficient address. Also, when Caleshu opened a new account she had used the wrong account executive number. She had repeated problems inputting data, whether it was a check or account executive information.
Borgognoni left Merrill Lynch's Clayton office on April 10, 1985 for another Merrill Lynch branch. After he left the office, he had no further contact with Caleshu or the Clayton office. Defendant's management, however, continued to receive numerous complaints regarding plaintiff's performance. For example, envelopes were returned for improper addresses which had been written by plaintiff. She was often away from her desk for extended periods of time which burdened other sales assistants. She was frequently tardy causing inconvenience and hardship to the other sales assistants. She was unwilling to answer *1079 the phones. She sent incorrect information to clients. At other times she failed to send any information to clients. On one occasion plaintiff mistyped a message which prevented a sale. She failed on one occasion to get the necessary information to a client regarding a tax shelter, and the time expired for the client. She never sent out check requests for credit balances when requested. Clients often called account executives complaining about Caleshu, and stating that they had received the wrong information. Plaintiff wired several accounts with incorrect street addresses. She made numerous clerical and filing errors. She failed to give account executives phone messages for several hours. She frequently left the office during work hours without permission. She regularly took long lunch hours without permission to attend to personal business. Her work was carelessly performed. Account Executives Rugen and Cusick believed that Caleshu was the worst sales assistant they had ever known. Almost all of these complaints were made by people who were unaware that plaintiff had filed an EEOC claim, and the Court finds the complaints to be true and accurate.
On June 14, 1985, DeStefano and Paradise had a meeting with plaintiff to counsel her about the problems with her work in an attempt to help her improve. Five days later, however, DeStefano received another complaint. He testified that the complaints about plaintiff were routine.
On June 25, 1985, DeStefano and Masten had a meeting with plaintiff regarding her attendance, extended lunch hours, telephone coverage, tardiness and other issues pertaining to her work performance. DeStefano advised plaintiff in accordance with company policy that she was being placed on a thirty-day probation. He further informed plaintiff in accordance with company policy that if the complaints about plaintiff continued, he would be forced to terminate her.
Plaintiff filed a second charge of discrimination with the EEOC against Merrill Lynch on July 19, 1985. She alleged that she was denied a promotion and was placed on probation in retaliation for her previous charge of discrimination.
After plaintiff's probation notice, her work performance continued to be unsatisfactory, and DeStefano continued to receive more complaints. She failed to properly enter a check issued to an account. She failed to timely mail a check. She failed to send the proper information to one client. She failed to relay important information to an account executive after taking a message. She failed to answer Account Executive Coomb's phone line, for which she was responsible as back-up. She failed to cover other sales assistants' lines. Account Executive Rugen asked to be transferred from Caleshu to another sales assistant on August 6, 1985 because Caleshu was negligent in her duties. All of the complaints made against plaintiff were made by people who were unaware of her EEOC claims, and the Court finds the complaints to be true and accurate.
As plaintiff's performance continued to deteriorate, DeStefano told Paradise and Masten to terminate her employment, which they did on August 13, 1985. Plaintiff then filed a third charge of discrimination with the EEOC against Merrill Lynch on September 3, 1985, alleging that she had been terminated in retaliation for filing previous charges with the EEOC and because of her age.
On January 20, 1986, plaintiff requested "Right to Sue" letters in connection with the three charges, acknowledging that the 180-day period had not run on the third charge. After finding less than 180 days had expired since the filing of the third charge, but determining that the EEOC would be unable to complete its administrative process within 180 days from the filing of the third charge, the EEOC issued a "Notice of Right to Sue" on January 28, 1986. Plaintiff filed her complaint in this Court on February 21, 1986 against Merrill Lynch and August Borgognoni.
Plaintiff's claims for battery and intentional infliction of emotion distress against Borgognoni were tried before a jury on June 24 through June 30, 1987. Plaintiff dismissed her assault claim against Borgognoni *1080 prior to trial, and subsequently abandoned her battery claim. She elected to submit only her intentional infliction of emotional distress claim against him to the jury. The jury returned a verdict in favor of Borgognoni.
Plaintiff's service letter and overtime claims against Merrill Lynch were passed for settlement on June 22, 1987, immediately prior to the trial of plaintiff's claim against Borgognoni. Upon consideration of the credible testimony regarding the settlement of these two counts, the Court finds the following to be true. The terms were negotiated by attorneys for Ms. Caleshu, Alan DeWoskin and Richard Byrd, and attorneys for defendant Merrill Lynch, Edwin Noel and Mary Kickham. The attorneys for Merrill Lynch and Caleshu negotiated and reported back to their respective clients several times prior to the settlement being reached. After considerable negotiations the settlement was reached. The terms of the settlement were as follows. In consideration for $5,001.00, plaintiff agreed to settle her claims, other than the Title VII claims, and to dismiss Counts IV and VIII of her second amended complaint with prejudice. Of the settlement amount, $2,500.00 was to be paid to plaintiff's attorney. These are the terms the Court understood the settlement to embrace.
Immediately thereafter plaintiff signed a memorandum passing Counts IV and VIII of plaintiff's second amended complaint for settlement. Alan DeWoskin, Edwin Noel and Borgognoni's attorney also signed the document. Pursuant to this memorandum, the Court ordered that Counts IV and VIII be passed for settlement.
Plaintiff contends that she signed the pass for settlement document under the direction of her former counsel, Alan DeWoskin, who she claims orally represented to her on the morning of June 22, 1987 that she would have to agree to settle Counts IV and VIII or the court would not allow her state tort claims relating to her lawsuit to be heard at trial. The Court finds this testimony to be untrue.
After the trial against Mr. Borgognoni began, Merrill Lynch's attorney Edwin Noel drafted what defendant believed the terms of the settlement to be. The written terms of the settlement were then presented to plaintiff's attorney Alan DeWoskin for his signature and that of his client the same day.
DeWoskin showed plaintiff the draft which contained the proposed terms upon which to settle Counts IV and VIII, but plaintiff informed her attorney that she did not intend to accept the terms set forth in the document.
The next day Mr. DeWoskin informed Mr. Noel that he needed more time to review the conditions of the settlement, and therefore he had not signed it. It was brought to the Court's attention that the parties were having problems completing their settlement. A record was made thereon at the beginning of the second day of the Borgognoni trial. On the record Mr. DeWoskin indicated that there was a problem with respect to the release of the claims. The Court stated at that time that if it were ever required to enforce the settlement, it would do so on the terms that it understood the settlement embraced.
On June 24, 1987, Mr. DeWoskin again attempted to obtain plaintiff's signature, but plaintiff refused to sign the document and told DeWoskin that the document did not reflect what she thought had been proposed for settlement of Counts IV and VIII.
Approximately one week after the end of the trial of the state tort claims, plaintiff received a typed proposed settlement agreement for her signature which she refused to sign because the document proposed terms to which she had not agreed or intended to accept. Two weeks later, plaintiff also received through her attorney DeWoskin a release for plaintiff's signature. Plaintiff refused to sign the release.
Without doubt, plaintiff knew the amount of the settlement of Counts IV and VIII was $5,001.00 before she signed the settlement memorandum. She also knew that $2,500.00 of the settlement was to go to her attorney for attorney's fees.

*1081 II. CONCLUSIONS OF LAW
This Court has jurisdiction over Counts I and II of Caleshu's complaint pursuant to 28 U.S.C. Section 1331, 42 U.S.C. Section 2000e, et seq., and 28 U.S.C. Section 1343. Plaintiff initiated Count I against defendant Merrill Lynch alleging sexual harassment in violation of Title VII. Count II alleges retaliation in violation of Title VII.

A. SEXUAL HARASSMENT
Title VII of the Civil Rights Act of 1964 makes it "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." The Supreme Court has held that sexual harassment at the work place is a violation of Title VII. Meritor Savings Bank, FSB v. Venison, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The courts have found that sexual harassment manifests itself in one of two forms: harassment that creates an offensive or hostile working environment, and harassment involving the exchange of concrete employment benefits for sexual favors (quid pro quo discrimination). Rabidue v. Osceola Reining Co., 805 F.2d 611, 618 (6th Cir.1986); Henson v. City of Dundee, 682 F.2d 897, 908 (11th Cir.1982).

1. Hostile Working Environment
The Supreme Court in Venison discussed at length the hostile working environment aspect of a sexual harassment claim. The Court focused on the phrase "terms, conditions, or privileges of employment," in holding that Title VII is not limited to economic or tangible discrimination. Venison, 477 U.S. at 66, 106 S.Ct. at 2405. The Court, however, was clear in stating that for "sexual harassment to be actionable, it must be sufficiently severe or pervasive `to alter the conditions of [the victim's] employment and create an abusive working environment.'" Venison, 477 U.S. at 67, 106 S.Ct. at 2405, quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir.1971).
To prevail in a Title VII hostile work environment action, the plaintiff must assert and prove that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition or privilege" of employment; and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action. Staton v. Maries County, 868 F.2d 996, 998 (8th Cir.1989); Jones v. Wesco Investments, Inc., 846 F.2d 1154, 1156 (8th Cir.1988); Hall v. Gus Construction Co., 842 F.2d 1010, 1013 (8th Cir.1988).
Two of the elements, that plaintiff belong to a protected group and that the harassment be based on sex, are generally not disputed elements. Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir.1986). Whether the activities complained of are unwelcome and affect a term, condition or privilege of employment are usually disputed, however. Id.
In order to constitute harassment, the conduct must be "unwelcome," in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive. Moylan, 792 F.2d at 749.
The harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment. Venison, 477 U.S. at 67, 106 S.Ct. at 2405. In order to establish that the harassment was sufficiently pervasive, the plaintiff must show a practice or pattern of harassment against her. A single incident or isolated incidents generally will not be sufficient. Moylan, 792 F.2d at 749. The plaintiff must generally show that the harassment is sustained and non-trivial. Id. at 750.
Whether sexual harassment at the work place is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined by the totality of the circumstances. Id. Included in the totality of the circumstances is evidence of sexual harassment *1082 directed at employees other than plaintiff, which is relevant to show a hostile working environment. Hall, 842 F.2d at 1015.
In considering the totality of the circumstances, the trier of fact must adopt the perspective of a reasonable person's reaction to a similar environment under essentially like or similar circumstances. Rabidue, 805 F.2d at 620. Thus, in the absence of conduct that would interfere with that hypothetical reasonable individual's work performance and affect seriously the psychological well-being of that reasonable person under like circumstances, a plaintiff may not prevail on asserted charges of sexual harassment, regardless of whether plaintiff was actually offended by the aggressor's conduct. Rabidue, 805 F.2d at 620.
The last element plaintiff must prove is that the employer, through its agents or supervisory personnel, knew or should have known, of the charged sexual harassment and failed to implement prompt and appropriate corrective action. Staton, 868 F.2d at 998. Plaintiff may establish this element by proving the complaints about the harassment were lodged with the employer, or that the harassment was so pervasive that employer awareness may be inferred. Katz v. Dole, 709 F.2d 251, 255 (4th Cir.1983).
In sum, plaintiff first must make a prima facie showing that the sexually harassing actions took place. The employer may rebut the showing either directly by proving the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Katz, 709 F.2d at 256. Second, plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. The employer can also rebut this showing directly, or by pointing to a prompt remedial action reasonably calculated to end the harassment. Id.
There is no doubt that plaintiff belongs to a protected group. Also, it is undisputed that any advances made toward plaintiff by Borgognoni were based on her sex. Jones, 846 F.2d at 998; Moylan, 792 F.2d at 749. The Court also finds that plaintiff was subject to unwelcome sexual advances. Jones, 846 F.2d at 998. The evidence suggests that Borgognoni kissed plaintiff two times, both against her will. The evidence also suggests that Borgognoni touched plaintiff's thigh on two different occasions, again against her will. Thus, plaintiff has established the first three elements of her hostile working environment claim.
Although plaintiff meets the first three elements of her claim, plaintiff clearly fails to prove that the harassment affected a term, condition or privilege of employment. Furthermore, she clearly fails to prove that the employer knew or should have known of the harassment and failed to take proper remedial action. Jones, 846 F.2d at 1156.
In order for Borgognoni's harassment to affect a term, condition or privilege of plaintiff's employment, plaintiff must establish that Borgognoni's actions were sufficiently pervasive so as to alter the conditions of her employment at Merrill Lynch. In other words, plaintiff has to prove that Borgognoni's conduct was so intimidating, offensive or hostile that it "poisoned" the work atmosphere for her. Scott v. Sears, Roebuck, 798 F.2d 210, 214 (7th Cir.1986).
Examining plaintiff's complaints against Borgognoni, the Court finds that over a five-month span Borgognoni kissed plaintiff on two occasions and touched her thigh on two occasions. All four of these acts occurred outside of defendant's offices. He told plaintiff two off-color jokes. He invited himself to dinner. He invited plaintiff to the Mutual Funds dinner. He required plaintiff to pick him up at the airport on one occasion. He gave her a birthday card and gift. Last, he showed up at a bar while she was there.
Adopting the perspective of a reasonable person's reaction to a similar environment under essentially like or similar circumstances, the Court finds that the total effect of Borgognoni's actions throughout the five months was not such that it could have interfered with a reasonable person's *1083 work performance or seriously affected the psychological well-being of that reasonable person. In fact, the Court finds that most of the actions complained of were trivial, such as asking plaintiff to the Mutual Funds dinner, giving plaintiff a birthday gift and card, showing up at the "Exchange" bar, and telling the jokes. Thus, the Court finds that plaintiff cannot prevail on her asserted charges of sexual harassment.
Not only has plaintiff failed to prove that the sexual harassment at the work place was sufficiently severe and persistent so as to alter the conditions of her employment and create an abusive working environment, plaintiff has also failed to prove that Merrill Lynch knew or should have known of the harassment and failed to take any remedial action. Staton, 868 F.2d at 998. Plaintiff stated that she did not lodge a complaint with defendant management until January 8, 1985, almost five months after the harassment apparently commenced. Even then, plaintiff told DeStefano only that Borgognoni was asking her out, and that it was bothering her.
The evidence is clear that once DeStefano learned of the problem between Plaintiff and Borgognoni he took immediate action. He talked to Borgognoni and asked him to leave plaintiff alone. Of special importance, plaintiff testified that from that moment on Borgognoni stopped bothering her. All harassment stopped. Thus, Merrill Lynch cannot be liable for the actions of Borgognoni. Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir. 1989).
When plaintiff complained to defendant management the second time in February, DeStefano again took immediate action. He moved plaintiff as far away from Borgognoni as was physically possible. He reassigned plaintiff to a position that she occupied prior to working with Borgognoni. Again, because defendant took remedial action, it cannot be liable for Borgognoni's harassment. Staton, 868 F.2d at 998.
In sum, until January 8, 1985 defendant management had no reason to believe that there were any harassment problems at the office. Plaintiff provides the testimony of Susan Malcolm and Gail Merkel to support her hostile environment claim, which the Court finds to be relevant to plaintiff's claim. However, neither of these women ever complained to defendant management about Borgognoni. Furthermore, the combined testimony of plaintiff, Merkel and Malcolm does not create an environment of harassment that was so pervasive that employer awareness may be inferred.
Accordingly, the Court finds that plaintiff has entirely failed to meet her burden in proving there existed a hostile working environment at Merrill Lynch, and the Court will enter judgment for defendant Merrill Lynch accordingly.

2. "Quid Pro Quo"
The gravamen of a "quid pro quo" sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct. Hicks v. Gates Rubber Co., 833 F.2d 1406, 1414 (10th Cir. 1987). An employer may not require sexual consideration from an employee as a quid pro quo for job benefits. Henson v. City of Dundee, 682 F.2d 897, 908 (11th Cir.1982); Barnes v. Costle, 561 F.2d 983, 995 (D.C.Cir.1977).
In order to establish violation of Title VII on grounds of quid pro quo sexual harassment, an employee must prove five elements: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the employee's reaction to the harassment complained of affected tangible aspects of the employee's compensation, terms, conditions or privileges of employment; and (5) the existence of respondeat superior liability. Highlander v. K.F.C. Natl. Management Co., 805 F.2d 644, 648 (6th Cir.1986); Henson, 682 F.2d at 909.
The first three elements are similar to the proof required to establish the *1084 existence of a hostile or offensive work environment. Henson, 682 F.2d at 909. As for the fourth prong, the acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment. Henson, 682 F.2d at 909. The plaintiff must prove she was deprived a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision. Id.
The fifth prong addressing corporate liability differs in quid pro quo cases from hostile work environment claims. In quid pro quo cases the employer is strictly liable for the actions of its supervisors that amount to sex discrimination or sexual harassment resulting in tangible job detriment to the subordinate employee. Henson, 682 F.2d at 910. The employer can only be held strictly liable for the conduct of supervisory employees, however, who have plenary authority over hiring, advancement, dismissal and discipline. Highlander, 805 F.2d at 648. This is so because a supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Because he is acting within the actual or apparent authority to hire, fire, discipline or promote entrusted to him by the employer when he makes employment decisions, his conduct can be fairly imputed to the source of his authority. Henson, 682 F.2d at 910.
In this case, plaintiff has established the first three prongs of a quid pro quo claim. However, plaintiff has entirely failed to establish that plaintiff's refusal to accommodate Borgognoni's advances would have affected tangible aspects of plaintiff's employment with Merrill Lynch. Further, the evidence is clear that Borgognoni did not have any authority to hire, fire, advance or discipline plaintiff. Thus, Merrill Lynch cannot be held liable for the actions of Borgognoni in plaintiff's quid pro quo claim.

B. RETALIATION
Section 2000e-3(a) of Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's opposition to any practice made unlawful by Title VII, or because the employee has made a charge under the Act. Sisco v. J.S. Alberici, 655 F.2d 146, 150 (8th Cir.1981). The statute provides an employee with immunity from retaliation for actions in connection with his or her participation in Title VII proceedings. The purpose of this protection is "to promote the implementation of equal employment rights and opportunities guaranteed by Title VII, and to ensure the effective implementation and maintenance of the statutory mechanisms for protection of these rights, and the elimination of unlawful employment discrimination. Mead v. U.S. Fidelity and Guaranty Co., 442 F.Supp. 114, 129 (D.Minn.1977).
A plaintiff alleging retaliation for participation in Title VII processes must show: "(1) statutorily protected participation; (2) adverse employment action; (3) a causal connection between the two." Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir.1980), cert. denied, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). As long as the employee had a reasonable belief that what was being opposed constituted discrimination under Title VII, the claim of retaliation does not hinge upon a showing that the employer was in fact in violation of Title VII. Sisco, 655 F.2d at 150.
Once the plaintiff has made out a prima facie case of retaliatory action, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. Womack, 619 F.2d at 1296. The employer need not prove the absence of retaliatory motive, but need only produce evidence that would "dispel the inference of retaliation by establishing the existence of a legitimate reason." Womack, 619 F.2d at 1296.
After defendant has articulated some legitimate, nondiscriminatory reason, the burden returns to plaintiff who is afforded *1085 the opportunity to demonstrate that the defendant's asserted reasons were merely a coverup, or pretext, for an unlawfully discriminatory decision. Mead, 442 F.Supp. at 129. The plaintiff must prove that the engagement in the protected activity constitutes a motivating factor in the discharge. Jackson v. Mo. Pac. R. Co., 803 F.2d 401, 406-07 (8th Cir.1986). The overall burden of persuasion remains with the plaintiff throughout this entire process. Womack, 619 F.2d at 1296.
Plaintiff alleges retaliation in three different respects. First, plaintiff claims that after she complained to Merrill management regarding Borgognoni's conduct, and subsequently filed her first EEOC claim on February 11, 1985, defendant retaliated against her by reassigning her to a different group of brokers, which she contends constituted a demotion. Plaintiff's second claim alleges that when defendant put plaintiff on probation in June 1985, it was in retaliation filing the February 11, 1985 EEOC charge. Last, plaintiff contends Merrill Lynch fired plaintiff in retaliation for filing her July 16, 1985 EEOC claim.
Beginning with the first retaliation claim, plaintiff engaged in a statutorily protected activity when she complained to management about Borgognoni's sexual harassment, and when she filed her first EEOC claim. However, the Court finds defendant's act of moving plaintiff from the position of Borgognoni's sales assistant to across the room to be the sales assistant of other brokers did not constitute an adverse employment action. Plaintiff requested the reassignment, she remained at the same grade and pay scale, and she had the same job responsibilities.
Even if the reassignment could constitute adverse employment action, plaintiff cannot establish a causal connection between the complaints and filing of the EEOC claim and the reassignment to another position. Plaintiff can only rely on the closeness in time between her filing of the complaint and the reassignment, which was eight days. The Court finds, however, that the time element in and of itself is insufficient to support a causal connection in this case.
Finally, even if plaintiff had been able to prove her prima facie case of retaliation, defendant clearly established a legitimate nondiscriminatory reason for the action. Defendant moved plaintiff to another position because plaintiff requested it. Further, defendant viewed this action as a remedy for the uncomfortable situation between plaintiff and Borgognoni.
The burden then shifted back to plaintiff to establish that defendant's action in reassigning plaintiff was merely a pretext to retaliation. Plaintiff has presented no evidence in support of such a finding. Thus, the Court finds that defendant did not retaliate against plaintiff when it reassigned plaintiff to another position within the Company.
As for plaintiff's second and third claims, plaintiff has also failed to carry her ultimate burden of persuasion in establishing retaliation on the part of defendant. In both instances plaintiff engaged in a statutorily protected activity when she filed the first and second EEOC claims. The Court also finds that the acts of putting plaintiff on probation and ultimately terminating plaintiff were adverse employment actions. Plaintiff, however, is once again unable to establish a causal connection between plaintiff's filing of the EEOC claims and the company's actions.
Had plaintiff been able to establish the causal connection, defendant clearly set forth legitimate nondiscriminatory reasons for its decision to put plaintiff on probation and to ultimately terminate her. Without rehashing the multitude of complaints filed against plaintiff, the Court believes its finding of fact clearly supports this conclusion.
Once again the burden then shifted back to plaintiff to establish that defendant's actions were a pretext to retaliation. There is no evidence to support such a finding.
Accordingly, the Court finds that defendant Merrill Lynch did not retaliate against plaintiff in violation of 42 U.S.C. Section *1086 2000e-3(a). Judgment will be entered accordingly.

C. ENFORCEMENT OF SETTLEMENT
Settlement agreements are favored by the courts. This Court has the inherent power to enforce a settlement agreement. Leon Industries, Inc. v. I.C.N. Pharmaceuticals, 472 F.Supp. 1241 (E.D.Mo.1979). Once parties have settled a dispute and have agreed to settlement terms, the parties cannot rescind it. Kelly v. Greer, 365 F.2d 669 (3rd Cir.1966), cert. den. 385 U.S. 1035, 87 S.Ct. 772, 17 L.Ed.2d 682 (1967). In order to determine whether the parties intended to be bound by the settlement prior to the execution of the written documents, a court must consider the course of negotiations, agreement on material terms, whether the parties described the settlement as such, and whether any existing disagreements were merely technicalities. Leon Industries, 472 F.Supp. at 1242.
In light of this Court's findings of fact regarding the settlement of these two counts, the Court concludes that the course of the settlement negotiations, the agreement of material terms, both parties' acknowledgement of the settlement, the parties signing of a pass for settlement document, and the Court's order that Counts IV and VIII be passed for settlement all indicate a valid settlement agreement was reached. Plaintiff, therefore, cannot now rescind the settlement agreement.
Plaintiff's attorney contends that the settlement agreement is voidable because plaintiff entered into the agreement under undue influence, because plaintiff was under duress when she agreed to the terms, and because there was failure of consideration. The Court finds each of these three arguments to be without merit.
Accordingly, the Court will grant defendant's motion to enforce the settlement of Counts IV and VIII entered into between plaintiff and defendant Merrill Lynch, and finds the terms of the settlement to be as follows:
1. The settlement represents a compromise of a disputed claim between the parties, and nothing herein is intended to nor is to be construed as an admission of any liability whatsoever by either Merrill Lynch or Sandra L. Caleshu.
2. Merrill Lynch will pay Sandra L. Caleshu $5,001.00. The check is to be made payable to Caleshu and her attorneys.
3. Sandra L. Caleshu will immediately dismiss with prejudice Counts IV and VIII of this lawsuit pending in this Court, No. 86-0403 C(5).
4. The settlement will be without prejudice to either party's assertions in the Title VII claims against Merrill Lynch. No mention of the settlement will be made in evidence in support of or in opposition to Plaintiff's Title VII claims. The pre-existing service letter, dated October 2, 1985, may be offered into evidence without objection based on this settlement.
5. Merrill Lynch will issue from its New York office a letter to Sandra L. Caleshu describing her duties at Merrill Lynch as an administrative and sales assistant to sales managers, among other duties. The letter will state that the reason she left Merrill Lynch was because her position was eliminated, and not replaced. Ms. Caleshu agrees she will never assert a claim against Merrill Lynch or its employees for issuing this letter.
6. Merrill Lynch agrees not to respond to inquiries pertaining to Sandra L. Caleshu's employment except in response to a written request from a prospective employer. In such event, Merrill Lynch will only respond stating the dates of Ms. Caleshu's employment, her job title and a statement that Merrill Lynch policy prohibits any further disclosure.
7. Merrill Lynch agrees that no member of management, or managers' secretary, at Merrill Lynch's Clayton office shall respond to any oral request for recommendation except to state that a written request must be made before a response can be given. Merrill Lynch shall not be required to monitor individuals other than management and managers' secretaries, who are personally asked about Sandra L. Caleshu.

*1087 8. Both parties acknowledge that the letters described in paragraphs 5 and 6 shall not be admitted or offered into evidence by either party in the Title VII claims. The fact of this settlement shall not affect either party's claims or defenses on the Title VII claims in any way.
9. Sandra L. Caleshu acknowledged full and complete payment, settlement and satisfaction of, and she does hereby forever release Merrill Lynch from any and all claims, demands, actions, damages, attorney's fees or expenses of any nature whatsoever, which she may have or hereafter have, or claim to have, against Merrill Lynch arising out of or in any way connected with matters involved in this law suit, Cause No. 86-0403 C(5), whether encompassed by the pleadings therein, or otherwise, and whether or not now known or contemplated of whatever name or nature. This is a full release of all claims against Merrill Lynch except for Counts I and II of plaintiff's second amended complaint (Title VII), and plaintiff's claim against Merrill Lynch for intentional infliction of emotional distress as set forth in Count III of plaintiff's second amended complaint.

III. CONCLUSION
In conclusion, the Court finds that defendant did not discriminate against plaintiff on account of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e-2(a). Further defendant did not retaliate against plaintiff due to her protests of defendant's alleged unlawful discriminatory practices in violation of 42 U.S.C. Section 2000e-3(a). Finally, the Court finds that defendant's motion to enforce the settlement of Counts IV and VIII is well-taken, and will therefore grant defendant's motion to enforce.

JUDGMENT AND ORDER
IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment is entered in favor of defendant and against plaintiff on plaintiff's Title VII claims set forth in Counts I and II of plaintiff's complaint in accordance with the accompanying memorandum.
IT IS FURTHER ORDERED that defendant's motion to enforce settlement is GRANTED in accordance with the terms set forth in the accompanying memorandum.
IT IS FURTHER ORDERED that defendant's motion for attorney's fees is DENIED as the Court does not find that plaintiff's action was so frivolous or without foundation as to entitle defendant to an award of such fees. American Family Insurance Co. v. Teasdale, 733 F.2d 559 (8th Cir.1984).