**Michelle M.N. FOSTER, Plaintiff,**

v.

**TOWNSHIP OF HILLSIDE,
et al., Defendants.**

Civ. A. No. 90–4030.

United States District Court,
D. New Jersey.

Jan. 6, 1992.

As Amended Jan. 30, 1992.

Barbara Flessas, Clifton, N.J., for plaintiff.

H. Reed Ellis, Thomas E. Moseley, Rosalie J. Shoeman, DeMaria, Ellis, Hunt & Salsberg, Newark, N.J., for defendants Township of Hillside, Hillside Police Dept., Charlotte DeFilippo, George Shelbourne and Frank DeSanto.

Robert S. Raymar, Eric A. Savage, Hellring Lindeman Goldstein & Siegal, Newark, N.J., for defendant Joseph Capasso.

## OPINION

WOLIN, District Judge.

Plaintiff, Michelle Foster ("Foster"), brought a complaint against defendants Joseph Capasso, ("Capasso") a Sergeant in Hillside Police Department's Record Room, George Shelbourne ("Shelbourne") Chief of the Hillside Police Department, Frank DeSanto ("DeSanto"), Deputy Chief of Police, Charlotte DeFilippo ("DeFilippo"), the Township of Hillside Clerk who is in charge of personnel matters, the Hillside Police Department and the Township of Hillside ("Hillside") (collectively the "defendants"). Plaintiff asserts both federal and state law claims against the defendants. These claims stem from Capasso's alleged sexual harassment of Foster.

This Court is faced with an important issue of first impression, whether defendants' response to plaintiff's sexual harassment claims insulated them as a matter of law from liability under Title VII. Before this Court is defendants' motion for summary judgment, as to all of Foster's state and federal law claims, pursuant to Fed. R.Civ.Pro. 56. For the reasons expressed below, this Court will grant defendants' motion for summary judgment on Foster's federal law claims asserted under Title VII, 42 U.S.C. § 1983, and the equal protection clause of the Fourteenth Amendment. Because this Court will grant summary judgment as to plaintiff's federal law claims, this Court will not exercise pendent jurisdiction over plaintiff's state law claims. Therefore, this Court will dismiss plaintiff's state law claims without prejudice.

## I. BACKGROUND

### A. *Foster's Work History*

On May 11, 1988 the Hillside Police Dept. provisionally appointed Foster as a civilian dispatcher.[1] DeFilippo Affidavit ¶ 3; Exh. A. On March 15, 1990, Foster reported

---

1. A provisional appointment can only last for one year.

that Capasso, the Sergeant in the records room, had sexually harassed her for approximately two years. DeSanto Affidavit ¶ 13. Both before and after Foster reported the sexual harassment, she repeatedly was late or absent from her position. Shelbourne Affidavit ¶ 4. In her affidavit, Foster admits that she had problems with attendance and lateness. Foster Affidavit ¶ 11, ¶ 15.

### 1. Foster's Work History Prior to Her Sexual Harassment Complaint

Prior to her report of sexual harassment, Foster repeatedly was tardy for work and she repeatedly abused her sick leave. Foster received reprimands for her continued unauthorized absences and lateness. Hillside's regulations concerning unauthorized absences provide:

> members or employees who absent themselves in an improper manner shall be subject to disciplinary action against them. Unauthorized absence occurs when members or employees:
>
> (a) are not at home ... while on sick leave, when visited by the department surgeon or an officer unless authorized by the chief of police to be away from home....

Although Foster acknowledged that she knew about the unauthorized absences regulation, she stated that she did not believe it applied to her. James Silva then told her that the regulation applied to her. DeSanto Affidavit ¶ 5, Exh. D.

Foster first received a written warning for absenteeism in the summer of 1989. Although Foster claimed she needed sick leave due to an auto accident, Hillside police officers "frequently saw her on the street, including once at 2:00 a.m.," and frequently Foster was not home when called by her superior, James Silva.

In addition, she failed to appear for work on October 7, 14, and 15, 1989 despite having exhausted her sick leave, and she was reprimanded as absent from duty. DeSanto Affidavit ¶ 8, Exh. J., Exh. K. On November 6, 1989, DeSanto sent a letter to Shelbourne documenting Foster's absences. He stated that Foster was absent for 31½

days between January 7, and November 4, 1989. DeSanto thought "Foster was abusing her sick time," and that "[i]t is very difficult to get optimum manpower on the road when C.E. Foster is as unreliable as she is." In his memo DeSanto also discussed Foster's most recent absences:

> Be advised that Foster who has no sick time left was out sick on November 2, 3, and 4, 1989. She states she was coming off prescribed medication, which made her dizzy. On November 3, 1989 I spoke to Foster who stated she would surely be in on November 4, She was not.
>
> She has been ordered to submit a doctor's slip, but I would recommend that she see a Township Physician to see if she is fit for work.

DeSanto Affidavit ¶ 11, Exh. S.

Foster also continued to arrive late for work. In a letter dated December 22, 1989, in which she "explained" her reason for being late on that day, Foster herself acknowledged that "tardiness has been a problem for me." DeSanto Affidavit Exh. T. Because of her continued lateness and absences, Foster again received a reprimand from Shelbourne on January 22, 1990. Specifically, Shelbourne told Foster that "you would be required to submit a Doctor's excuse each time you are out sick and that if you [continue to arrive at work late], I will expect that disciplinary action be taken against you." DeSanto Affidavit Exh. U.

In fact, DeSanto proffered disciplinary charges against Foster for insubordination and violation of the chain of command. DeSanto Affidavit ¶ 10, Exh. O. Foster's insubordination consisted in part of statements that she made to DeSanto. For example, Foster stated to DeSanto, "people couldn't walk home from school at 3:00 p.m. without being attacked, and we don't do anything about it.... You don't live in this town and you don't care." Further, instead of speaking with her immediate superior about her grievances, Foster spoke to DeSanto, thus violating the chain of command. Shelbourne held a hearing regarding the charges. DeSanto Affidavit Exh. P. He found Foster guilty of the

charges and fined her two days' pay. De-Santo Affidavit Exh. Q.

Moreover, even though Shelbourne opposed Foster's request for a leave of absence to work as a dispatcher with the New Jersey State Police, Foster left the Hillside Police Department on August 24, 1989, to work as a dispatcher with the New Jersey State Police. DeSanto Affidavit ¶ 6, Exh. F. Foster's attendance problems continued when she worked for the New Jersey State Police. DeSanto Affidavit Exh. G., Exh. H. She resigned from the New Jersey State Police because she feared for other's safety due to the fact that fatigue prevented her from performing her job well. DeSanto Affidavit Exh. I.

### 2. Foster's Work History After Her Sexual Harassment Claim

Foster's chronic absenteeism and lateness continued after she reported that Capasso had sexually harassed her. For example, on April 22, 1990, Foster reported back from sick leave seven minutes after her shift had started. She did not inform the Hillside Police Department that she would return to work on April 22, 1990, until 7:00 a.m., at the start of her shift. Because Foster did not tell her superiors that she intended to return to work until the start of her shift, the Hillside Police Department needed to summon an officer to work on his day off. At this time, Foster already had been absent from work for 11½ days during 1990. Due to her "prior record of being late" and her "reprimand for tardiness that was on file," Lieutenant Yeachshein charged Foster with tardiness, and Captain Cenker agreed with this charge. DeSanto Affidavit ¶ 19, Exh. GG.

Further, on May 11, 1990, Foster failed to report for her shift. She did not follow the Hillside Police Department's procedure and timely notify her superiors. Instead she waited until after her shift had begun to inform her superiors about her absence from work. She alleged that she was absent because she overslept and because she had scheduled minor surgery for the afternoon. Captain Cenker brought disciplinary charges against Foster for her failure to provide timely notice to the Hillside Police Department concerning her absence. Shelbourne dismissed the disciplinary charges brought against Foster by both Lieutenant Yeachshein and Captain Cenker, and she only received a reprimand for her behavior. DeSanto Affidavit ¶ 20, Exh. HH; Foster Affidavit ¶ 49. DeSanto also reprimanded Foster for abusing the phone system. DeSanto Affidavit ¶ 18, Exhs. EE and FF.

Additionally, on June 4, 1990, Foster failed to appear for work. Again, Foster failed to abide by the Hillside Police Department's regulations. On June 3, Foster had requested time off for the morning of June 4. Her supervisor, Captain Cenker, refused to honor her request, because the Hillside Police Department had scheduled C.P.R. training on that morning. Even though her supervisor would not allow Foster time off on the morning of June 4, Foster still was absent on that day.

A memo from Foster's supervisor to De-Santo documents Foster's patent disregard of the Hillside Police Department's procedures. According to the memo, Foster called the Hillside Police Department at 1:20 a.m. on June 4 and asked Sergeant Miller, the person in charge of the night shift, "to put her in for a personal day." Sergeant Miller refused and told her that she must "clear a personal day with her supervisors." Foster then asked Sergeant Miller to "put in a Sick Card for her." Sergeant Miller responded that "she would probably get into trouble over this action and that she should come to work in the morning and work something out with her Boss for time off." Despite this warning, Foster still "insisted on a Sick Card."

Foster alleged that she needed the time off due to a family emergency—her mother had fallen down steps. Nevertheless, Foster never contacted her superiors about the "family emergency." In fact, according to the memo, Foster's supervisor dispatched an officer, Sergeant Silva, to Foster's home. Sergeant Silva conversed with Foster's father. Foster's father told Sergeant Silva that his wife had injured her leg the

previous week, that his wife had an appointment with the doctor on the afternoon of June 4, and that Foster was sleeping.

Nevertheless, when confronted by her supervisor, Foster stated that her mother had re-injured her leg the night of June 3. Moreover, when asked why she failed to contact the supervisors on her shift, as she had previously done, she had no response. Additionally, according to the memo, Foster told her supervisor that "she was under a lot of stress and that she did not believe that she was functioning well at work." Foster's supervisor concluded that:

> She was not ill at 1:20 a.m. when she reported that she was ill, nor was she in a serious enough situation to invoke the Sick Leave statute.... Her last minute or total lack of proper notification protocol is her major problem. The issue of proper channels, chain of command, notification procedures, accountability and staffing consideration have all been discussed at length with Ms. Foster on previous occasions. She had acknowledged each time that she understood these clarifications of the department's rules and regulations....

DeSanto Affidavit ¶ 21, Exh. II. Thus, after Foster reported that Sergeant Capasso had sexually harassed her, she still continued to disregard the Hillside Police Department's policies.

### B. Foster's Allegations of Sexual Harassment

On March 15, 1990, Foster reported that Capasso had sexually harassed her. DeSanto Affidavit ¶ 13. According to Foster, Capasso began sexually harassing her in September 1988 and continued to harass her through March 1990. Foster Affidavit ¶¶ 21–25. In September 1988, Capasso allegedly offered to model women's lingerie for Foster. Foster Affidavit ¶ 21. Thereafter, the sexual harassment allegedly worsened. For example, she asserts that in 1989, Capasso requested that Foster engage in sado-masochistic conduct with him, he exposed himself to Foster, and he masturbated in front of Foster. Foster Affidavit ¶ 23. Foster reported to her supervisors that Capasso not only threatened to model lingerie for her, but actually wore a brassiere that Foster could see under his shirt. Foster Affidavit ¶¶ 31–33.

Capasso has denied that he sexually harassed Foster. DeSanto Affidavit ¶ 15, Exh. BB. Moreover, Capasso was not Foster's supervisor and had no authority to hire, fire, promote or make any employment decision regarding her. DeSanto Affidavit ¶ 13; Shelbourne Reply Affidavit ¶ 2. Further, pursuant to his request, on April 23, 1990, about a month after Foster brought her sexual harassment complaint against Capasso, he transferred out of the record room to street patrol. DeSanto Reply Affidavit ¶ 2, Exh. A. After her initial complaint, Foster never complained that Capasso sexually harassed her. Shelbourne Reply Affidavit ¶ 2. Further, Foster never requested that she or Capasso be transferred. DeSanto Reply Affidavit ¶ 2.

### C. Defendants' Response to Foster's Sexual Harassment Allegations

On March 15, 1990, the day that Foster informed her superiors that Capasso sexually harassed her, Shelbourne interviewed Foster and took a statement from her. Further, he informed Foster that she could press criminal charges against Capasso. At this time, Foster declined to press criminal charges. DeSanto Affidavit ¶¶ 14, 16, Exh. V. Moreover, Shelbourne told Capasso to "stay clear of Foster." Shelbourne Reply Affidavit ¶ 2.

The same day, Shelbourne met individually with each woman whom Capasso supervised. Shelbourne told each woman that he suspected that Capasso had acted improperly toward women in the office. Each woman gave a statement to Shelbourne. DeSanto, Cenkner, and Galloway also were present at these meetings. DeSanto Affidavit ¶ 14. Additionally, as part of its internal investigation, members of the Hillside Police Department interviewed Foster's mother and sister. Detective Lieutenant Galloway interviewed Foster's co-worker, Dorothy Protzmann. DeSanto Affidavit ¶ 15, Exhs. X and Z.

On March 19, four days after Foster informed her superiors about Capasso's behavior, Shelbourne contacted Charlotte DeFilippo, Township Clerk, who was in charge of personnel. DeFilippo determined that she should employ an independent arbitrator to inquire into Foster's claims. On March 29, ten days after Foster's initial allegations, DeFilippo retained Barbara Tener to investigate Foster's assertions. DeFilippo Affidavit ¶ 5. In the interim, Foster had retained an attorney. On April 24, 1990, DeFilippo notified Foster's attorney that Tener had been selected as an independent arbitrator. On that same day Foster's attorney wrote that Foster had no objection to Tener and that she agreed to cooperate in the fact finding investigation. Moseley Affidavit ¶ 2, Exh. A.

Tener began her investigation on April 4, 1990, but neither Foster nor Capasso would speak with her. Foster later agreed to speak with Tener with her attorney present. Capasso, however, refused to speak with Tener. DeFilippo Affidavit ¶ 6. On March 22, 1990, Foster pressed criminal charges against Capasso. DeSanto Affidavit ¶ 16, Exhs. CC and DD. Capasso's attorney advised Hillside's lawyer that Capasso would not speak with Tener until after the criminal case against him was resolved. DeFilippo Affidavit ¶ 6; Moseley Affidavit Exh. D. On September 4, 1990, six months after she instituted her criminal complaint, Foster voluntarily withdrew her criminal complaint against Capasso. Foster's attorney, whom Foster retained in April 1990, stated on the record:

> These criminal complaints were assigned by my client prior to her retaining counsel. And I have discussed the matter with her, and explained the complaint to her, and I have advised her not to pursue this matter criminally, but that she would pursue it civilly.

Moseley Affidavit Exh. F.

On the day that Foster dropped her criminal charges, Hillside's attorneys sent Capasso's attorney a letter in which they re-

quested Tener to interview Capasso. Moseley Affidavit Exh. G. Tener interviewed Capasso, with his attorney present, on September 26, 1990. DeFilippo Affidavit Exh. D. She issued her report on October 12, 1990. Tener concluded that Capasso did not sexually harass Foster. Hence, she advised the Hillside Police Department not to take any adverse action against Capasso. During the course of her investigation, Tener interviewed Foster and Capasso, as well as 18 co-workers and supervisors of both Capasso and Foster. Further, she considered the Hillside Police Department's internal investigation. The Hillside Police Department issued a sexual harassment policy in December 1990. DeFilippo Affidavit Exh. D.

### D. Foster's Allegations that Defendants Failed to Appropriately Investigate Her Sexual Harassment Claim

Foster asserts that defendants failed to appropriately and to timely investigate her sexual harassment claim. Hence, she concludes that defendants are liable under Title VII.[2] She posits four reasons for her allegations. First, Foster contends that Tener improperly failed to consider her lie detector test. Plaintiff's Brief in Opposition to Summary Judgment ("Plaintiff's Brief") at 12–13; Foster Affidavit ¶¶ 42–44. Second, she asserts that defendants "dragged their feet" because they allowed Tener to take seven months to complete her investigation. Plaintiff's Brief at 10–12; Foster Affidavit ¶¶ 40–41. Third, she argues that Tener refused to force Capasso and Foster to undergo psychological evaluations. Plaintiff's Brief at 29; Foster Affidavit ¶ 40. Fourth, she contends that the defendants did not conduct a proper investigation because they failed to effectuate a sexual harassment policy until nine months after Foster reported that Capasso had sexually harassed her. Plaintiff's Brief at 29; Foster Affidavit ¶ 40.

Moreover, Foster claims that the defendants' failure to sufficiently and to prompt-

---

**2.** At oral argument Foster's attorney admitted that defendants had no reason to know about Capasso's alleged harassment prior to the time

Foster informed them about the alleged harassment.

ly investigate her sexual harassment claims created a hostile environment.[3] Specifically, she states that unnamed others joked about the alleged sexual harassment. Plaintiff's Brief at 10; Foster Affidavit ¶ 36.

Defendants retort that they properly responded to Foster's allegations. In particular, they state that Tener did not have to rely on polygraph evidence which is both unreliable and inadmissible. Defendants' Brief in Support of the Motion for Summary Judgment ("Defendants' Brief") at 29–30. Further, they state that Tener did not simply "drag her feet" in her investigation, but that she could not complete her investigation because Capasso refused to speak with Tener until Foster dismissed the criminal charges she brought against Capasso. Defendants' Brief at 26–28; Moseley Affidavit ¶ Exh. D. Specifically, in a letter to DeFilippo, Tener stated that she would not make any determination prior to interviewing Sergeant Capasso. Moseley Reply Affidavit Exh. A.

### E. *Foster's Report to the EEOC and Her Claims of Retaliation*

Foster filed a grievance with the Equal Employment Opportunity Commission (the "EEOC") on May 7, 1990. She alleged that her employer violated title VII by responding inadequately to her sexual harassment claims. She asserts that defendants then repeatedly retaliated against her, in violation of Title VII, because she reported the sexual harassment to the EEOC. Plaintiff's Brief at 13–17; Foster Affidavit ¶¶ 45–56. Foster alleges that her employers retaliated against her in six separate acts.

#### 1. The May 14, 1990 Meeting

According to Foster, defendants first retaliated against her on May 14, 1990. On that day, Shelbourne called Foster into his office and asked her about the charges she filed with the EEOC. DeSanto and Captain Henry Cenker were also present at the meeting. She alleges that Shelbourne accused her of making "false and misleading statements to the EEOC." Specifically, DeSanto said to her "are you trying to build a case against us." Moreover, they "reminded her that her statements to the EEOC were made under penalty of perjury." Finally, they discussed her attendance record. Plaintiff's Brief at 13–14; Foster Affidavit ¶¶ 46 and 47; DeSanto Affidavit Exh. KK. Defendants contend that these claims are ripe for summary judgment because, even accepting Foster's version of the meeting, she has not alleged that the defendants engaged in any adverse employment action. Defendants' Reply Brief in support of their motion for summary judgment ("Defendants' Reply Brief") at 11–12.

#### 2. The Canceled Disciplinary Hearing

Foster next asserts that defendants retaliated against her in May 1990, when Shelbourne scheduled a disciplinary hearing. Shelbourne scheduled the hearing because Foster was seven minutes late on April 24, 1990 and one hour late on May 11, 1990. Plaintiff's Brief at 14–15; Foster Affidavit ¶ 49. Moreover, Foster alleges that Shelbourne asked her "to sign a waiver of a civil service requirement that no disciplinary hearing be held until two weeks after disciplinary charges are served." She further states "that after her attorney spoke with [Hillside's] attorney, Shelbourne canceled the disciplinary hearing and never again asked her to sign a waiver." Foster Affidavit ¶ 51. Foster received a warning for her tardiness.

Defendants contend that this retaliation claim is ripe for summary judgment for two reasons. First, a canceled disciplinary meeting cannot constitute retaliation, because they took no adverse action against her. According to the defendants, attempted retaliation is not actionable under Title VII. Defendants' Reply Brief at 12–13. Second, the defendants argue that a valid non-discriminatory reason existed for their

---

**3.** In her Amended Complaint, Foster further alleges that Defendants created a hostile working environment because they did not keep Foster's allegations against Capasso confidential. She has not, however, attempted to support this claim.

actions. In particular, defendants point to the memorandum sent to Foster from Shelbourne on January 22, 1990. In that memo Shelbourne reprimanded Foster for her absenteeism and her tardiness. Significantly, Shelbourne explicitly warned Foster that "if you do not show improvement in this area, I will expect [that] disciplinary action [will] be taken against you." DeSanto Affidavit Exh. U. Thus, defendants urge that they have shown a legitimate non-discriminatory reason for their actions. Therefore, they conclude they have not retaliated against Foster.

### 3. The Disciplinary Warnings

Foster also alleges that the disciplinary warnings for arriving seven minutes late on April 24, 1990, and one hour late on May 11, 1990, constitute retaliation. Plaintiff's Brief at 15; Foster Affidavit ¶ 52. The defendants again argue that they have articulated a non-discriminatory reason for the warning; namely Foster appeared for work after her shift began. DeSanto Affidavit ¶¶ 19 and 20. Foster retorts that the warnings constitute retaliation because "unnamed others" had not been warned for similar violations. Foster Affidavit ¶ 52. She supports her claim with an "admission" by Chief Shelbourne and Deputy Chief DeSanto. According to Foster:

> They did not deny that other dispatchers were not similarly treated and only stated to me that other dispatchers' relationships with their lieutenants are different and that my lieutenant's complaint about the seven minute lateness had precipitated the disciplinary warning against me.

Foster Affidavit ¶ 52.

### 4. The Confirmatory Letter

Further, Foster avers that defendants retaliated against her on September 13, 1990, when Chief Shelbourne asked her to confirm a conversation that Foster had with Shelbourne. During that discussion, Foster stated the reasons she dismissed the criminal complaints she had instituted against Capasso. Plaintiff's brief at 16–17; Foster Affidavit ¶¶ 55 and 56.

Defendants reply that Foster's claim does not constitute retaliation. At the out-set, defendants assert that Foster failed to file the retaliation claim with the EEOC within 180 days of the alleged retaliation. Hence, she is barred by the statute of limitations from bringing the claim. Moreover, defendants assert that the confirmatory letter does not constitute adverse employment action. Defendants' Reply Brief at 14.

Finally, Shelbourne asserts that he sent the confirmatory letter to Foster for a legitimate non-discriminatory reason. In particular, Shelbourne avers that he sent the confirmatory letter on the advice of the Union County Prosecutor's Office. Shelbourne asked the Union Prosecutor's Office whether Foster's voluntary dismissal of the criminal charges against Capasso disposed of the case against Capasso. The Union Prosecutor's Office informed Shelbourne that the dismissal concluded the criminal action. Further, the Union Prosecutor's Office recommended that Shelbourne send a confirmatory letter to Foster. Shelbourne Reply Affidavit ¶¶ 6 and 7, Exh. B.

### 5. The Request for Disability Pay

Additionally, Foster maintains that DeFilippo misinformed her about how to file a request for disability. Specifically, Foster, who was denied paid disability, asserts that "her requests for disability pay were either ignored or mishandled by the Government defendants." Plaintiff's Brief at 15; Foster Affidavit ¶¶ 53 and 54. She further alleges that when she spoke with DeFilippo, she told Foster "something to the effect of, I don't even know if I should be talking to you because I'll probably just get another EEOC charge." Foster Affidavit ¶ 54. Foster never alleges, however, that DeFilippo refused to give her information. Moreover, Foster never alleges how her claims were "ignored or mishandled."

Again, defendants allege that they denied Foster's request for disability pay based on a legitimate nondiscriminatory reason. Defendants' Reply Brief at 16–17. Specifically, DeFilippo asserts that Foster did not receive disability pay because the claims representative for Hillside's workers

compensation carrier "advised Hillside that Foster would not be eligible for disability leave." DeFilippo Affidavit ¶ 9. Moreover in her reply affidavit, DeFilippo avers that Hillside's policy is to refuse to pay for an employee's disability leave when the workers compensation carrier denies coverage for the employee. DeFilippo Reply Affidavit ¶ 4. She reasoned that budgetary constraints forced Hillside to abide by this policy. Furthermore, she declares that Foster had used all of the time allocated to her when she requested disability leave with pay. DeFilippo Reply Affidavit ¶¶ 5–7.

The reply affidavit of Janet Vlaisavljevic, the principal clerk typist for the Township of Hillside Clerk, confirms that DeFilippo correctly stated Hillside's policy. Based on a review of the Hillside Police Department's official records, Ms. Vlaisavljevic avers that during the past five years the Hillside Police Department "has not granted sick leave with pay to any employee after that employee has exhausted his or her accumulated sick days, vacation days, and personal days." Vlaisavljevic Affidavit ¶ 2. Further, she concluded that "in the past five years the Township has not granted leave with pay to any employee for an injury that the employee claimed to be work related unless the representative of the worker's compensation carrier for the Township first approved coverage." Vlaisavljevic Affidavit ¶ 3. Although Hillside's records concerning paid disability leave were made available to Foster's counsel prior to oral argument, her attorney has not shown the Court how Foster was disparately treated regarding disability pay, nor has her attorney brought a motion under Fed.R.Civ.P. 56(f), to oppose summary judgment based on insufficient time for discovery.

### 6. Hillside's Refusal to Reinstate Foster

Finally, Foster seems to claim that the defendants retaliated against her when they refused to reinstate her after her psychiatrist deemed her fit for duty on December 31, 1990. Plaintiff's Brief at 21. Foster's attorney and the attorney for Hillside and the Hillside Police Department, agreed that after Foster's psychiatrist concluded

that she was fit to return to duty, Hillside's doctors would examine her in order to determine her ability to return to her former position. Moreover, the attorneys agreed that if Hillside's doctors' opinion differed from Foster's psychiatrist's opinion, then Hillside would select a psychiatrist who performed evaluations for the New Jersey State Police to examine Foster. Moseley Reply Affidavit ¶ 3, 4, and Exh. B. Because the opinions of Hillside's psychiatrist, Dr. Ferretti, differed from the opinion of Foster's psychiatrist, a psychiatrist who evaluated New Jersey State Police employees conducted a psychiatric examination of Foster.

Hillside contends that it refused to reinstate Foster not as an act of retaliation in violation of Title VII, but because she could not perform her job due to her psychological state. Hillside relies on the opinions of its psychiatrist and the psychiatrist employed by the New Jersey State Police. According to Hillside, Dr. Ferretti could not opine about Foster's fitness without making any assumptions about the truthfulness of Foster's allegations against Capasso. Dr. Ferretti found that, if Foster was "reasonably truthful and accurate in her narration then she could be reinstated ... despite some evidence of psychiatric symptomology." Dr. Ferretti also stated, however, "[that if Foster was not truthful then] my diagnosis, recommendations, and prognosis could be conceivably altered." Moreover, Dr. Motley, the New Jersey State Police psychiatrist, concluded that Foster was not fit to return to her position as a civilian dispatcher. Significantly, in order to apprise himself fully about Foster, Dr. Motley requested that Foster submit to a battery of psychological tests and provide to him records of the psychiatrists who previously had treated her. She refused, however, to provide the information. Moseley Reply Affidavit, Exh. B, Exh. C. Finally, Hillside alleges that Foster's own psychiatrist seems to equivocate about Foster's ability to return to her dispatcher position. Specifically in a letter to Foster's counsel, Foster's psychiatrist stated:

In December 1990 and in January 1991 I felt that her condition had improved to the extent that she could go back to work but only the notion of facing Sergeant Capasso or entering the same environment brought back all anxieties, fears and depression and Miss Foster has not yet returned to work.

Moseley Reply Affidavit Exh. D. Based on the reports of Drs. Ferretti and Motley, as well as Foster's psychiatrist's statement, Hillside contends that it would not reinstate Foster.

During oral argument, Foster's attorney alleged that Hillside conspired with Dr. Ferretti to ensure that he would not find Foster fit for duty and thus, Hillside retaliated against Foster. Foster's counsel, however, offered no evidence of the alleged conspiracy.

### F. Foster's Claims Based on 42 U.S.C. § 1983 and the Equal Protection Clause

Foster contends that defendants violated 42 U.S.C. § 1983 ("§ 1983") because they denied her equal protection guaranteed by the Fourteenth Amendment when they failed to investigate her sexual harassment claims properly and when they retaliated against her for filing a sexual harassment claim with the EEOC. In particular, Foster alleges that defendants are liable under § 1983, because they either acquiesced in the sexual harassment by not conducting a proper investigation or had a policy to encourage the sexual harassment by not conducting a proper investigation. Plaintiff's Brief at 41.

Defendants contend that they neither acquiesced in the sexual harassment claim nor promulgated any official policy concerning sexual harassment. Defendants' Brief at 34–35. Further, Shelbourne, DeFilippo and DeSanto aver that they are protected by qualified immunity because the Third Circuit has not determined what constitutes an appropriate investigation to a sexual harassment claim. Defendants' Brief at 37–38. Finally, defendants contend that the § 1983 claims based on defendants' retaliatory acts fail because they are based on a violation of Title VII and not on a violation of the Constitution. Defendants' Reply Brief at 20. Therefore, defendants conclude that this Court should grant them summary judgment as to the § 1983 claims.

In her complaint, Foster further declares that defendants violated her rights under the Equal Protection Clause of the Fourteenth Amendment. Defendants argue that this claim must be dismissed because it involves the same conduct as does the § 1983 claim and therefore, is redundant to the § 1983 claim. Defendants' Brief 38–39.

## II. DISCUSSION

### A. The Standard For Granting Summary Judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.; Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir.1989).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325,

106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511; *Radich*, 886 F.2d at 1395. Thus, a party opposing summary judgment "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir.1991). Whether a fact is material is determined by substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *United States v. 225 Cartons*, 871 F.2d 409, 410 (3d Cir.1989).

An affidavit in opposition to a properly-supported motion for summary judgment must: (1) show affirmatively that the affiant "is competent to testify to the matters stated therein;" (2) be based on "personal knowledge;" and (3) establish facts that "would be admissible at trial." Fed. R.Civ.P. 56(e); *see Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (3d Cir.1988). In sum, an affidavit offered in opposition to a motion for summary judgment must establish a proper foundation for the facts stated within it. *Williams v. West Chester*, 891 F.2d 458, 471 (3d Cir.1989) (Garth, J., concurring). Affidavits that fail to satisfy these requirements "may not be considered" on a motion for summary judgment. *Hlinka*, 863 F.2d at 282–83.

Additionally, the affidavit "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Therefore, the non-movant "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, —— U.S. ——, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). The Court is not to presume the existence of specific facts from general averments. *Id.* The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Id.* 110 S.Ct. at 3188–89.

**B.  *The Sexual Harassment Claims*** [4]

Under Title VII, an employer can be liable for sexual harassment of its employees under two theories, quid pro quo and hostile environment. Under a quid pro quo theory, liability exists when an employer threatens to alter an employee's job conditions if the employee will not assent to the employer's sexual demands. *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989). On the other hand, a hostile work environment claim does not refer to a threat to change working conditions if an employee will not agree to sexual favors, but instead is defined as "conduct ... so pervasive that it had the effect of creating an intimidating hostile, or offensive work environment." *Andrews v. Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990) (*citing Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2495, 91 L.Ed.2d 49 (1986)).

The Third Circuit has announced that in order to prove a hostile work environment claim a plaintiff must establish the following five elements:

(1) the employee suffered intentional discrimination because of [his or her] sex;

(2) the discrimination was pervasive and regular;

(3) the discrimination detrimentally affected the plaintiff;

---

**4.** Capasso correctly asserts that Foster can not bring a Title VII claim against him because he was not her employer nor an agent of her employer. Importantly, Capasso had no authority to fire, hire or make any employment decision regarding Foster.

(4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and

(5) the existence of respondeat superior liability.

895 F.2d at 1482.

■ The first four factors determine whether a hostile environment exists. The last factor establishes the employer's liability for the hostile environment. According to the *Andrews* court, respondeat superior liability exists when:

the defendant knew or should have known of the harassment and failed to take prompt remedial action. Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable (internal citations omitted).

895 F.2d at 1486. Foster asserts a hostile work environment claim against defendants. Specifically, she alleges that the defendants failed to take prompt remedial action after she reported that Capasso sexually harassed her.[5] Because there is no factual dispute as to defendants actions, and this Court finds that as a matter of law defendants "took prompt and adequate remedial action" in response to Foster's allegations, these claims fail.[6]

Although the Third Circuit in *Andrews* defined respondeat superior liability, the *Andrews* Court did not apply the standard to the case before it. Courts that have decided the issue, have placed great weight on whether the harassment ended after remedial steps were taken. *See Caleshu v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 737 F.Supp. 1070 (E.D.Mo.1990) ("The evidence is clear that once DeStafano learned of the problem between Plaintiff

and Borgogoni he took immediate action. He talked to Borgogoni and asked him to leave plaintiff alone. Of special importance, plaintiff testified that from that moment on Borgogoni stopped bothering her. All harassment stopped. Thus, Merrill Lynch cannot be liable for the actions of Borgogoni."); *Steele v. Offshore Shipbuilding Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989) ("Of special importance, Bucknole's harassment ended after the remedial action; the corporate employer, therefore, is not liable for Bucknole's actions under the doctrine of respondeat superior."); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir.1987).

In the case at bar, Foster never reported that Capasso sexually harassed her after her initial complaint. Shelbourne Reply Affidavit ¶ 2. In fact, one month after her initial complaint against Capasso, he transferred from his position in the records room at his request. DeSanto Reply Affidavit ¶ 2. Furthermore, as in *Caleshu*, Capasso's supervisor, Shelbourne, confronted him and specifically told him to "stay clear of Foster." Shelbourne Reply Affidavit ¶ 2.

Additionally, courts consider whether the employer investigated the alleged acts of harassment and the type of investigation the employer conducted. For example, in *Barrett v. Omaha National Bank*, 726 F.2d 424, 427 (8th Cir.1984), the court affirmed the district court's finding that the employer had conducted an adequate investigation. In particular, the court noted that the employer interviewed the alleged harassers, the alleged victim, and co-employees who attended the seminar where the harassment occurred.

Similarly, in *Swentek*, the court refused to find any respondeat superior liability. The court based its decision, in part, on the employer's prompt investigation. After

---

**5.** Defendants do not dispute that Capasso's alleged action created a hostile environment.

**6.** Defendants urge this Court to adopt a bright line rule to insulate an employer from liability under Title VII when one employee accuses a co-employee of sexual harassment. Specifically, defendants implore this Court to adopt the following rule: "when one employee accuses

another of sexual misconduct and the latter denies those allegations, the employer satisfies Title VII ... by having those allegations investigated by an independent factfinder and following the factfinder's recommendations." This Court refuses to adopt such a rule, in light of the factual intensive inquiry into a potential violation of Title VII.

the plaintiff (a flight attendant) reported that defendant (a pilot) had harassed her, the director of flying read the plaintiff's complaint and questioned the defendant about the allegations. The defendant denied plaintiff's more egregious charges which included grabbing the plaintiff, but admitted that he had engaged in "some unprofessional language and conduct." Furthermore, the director of flying "interviewed other employees, seeking corroboration of [plaintiff's] complaint." 830 F.2d at 558. The court held that "in taking remedial action, [defendant] was obliged to investigate [plaintiff's] charges and to present a reasonable basis for its subsequent action. It was not however, required to credit all of [plaintiff's] allegations in order to escape liability." *Id.* Thus, defendants did not have to credit plaintiff's allegations in order to avoid liability.

In the instant case, defendants adequately and timely investigated Foster's claims against Capasso. As in *Barrett* and *Swentek*, the Hillside Police Department conducted an investigation in order to elucidate and substantiate Foster's claims. On March 15, 1990, the day that Foster informed her superiors that Capasso sexually harassed her, Shelbourne interviewed Foster and took a statement from her. Shelbourne also interviewed Capasso. He denied Foster's charges. DeSanto Affidavit ¶¶ 14, 16, Exh. U.

The day Foster reported the harassment, Shelbourne met individually with each woman whom Capasso supervised. Shelbourne told each woman that he suspected that Capasso had acted improperly toward women in the office. Each woman gave a statement to Shelbourne. None of them stated that Capasso had acted improperly toward them. DeSanto Affidavit ¶ 14. Additionally, as part of its internal investigation, members of the Hillside Police Department interviewed Foster's mother and sister. Detective Lieutenant Galloway also interviewed Foster's co-worker, Dorothy

Protzmann. DeSanto Affidavit ¶ 15, Exhs. X and Z.

Moreover, after Shelbourne informed DeFilippo about Foster's allegations, DeFilippo determined that she should employ an independent arbitrator to inquire into Foster's claims. On March 29, 10 days after Foster's initial allegations, DeFilippo retained Barbara Tener to investigate Foster's assertions. DeFilippo Affidavit ¶ 5. During her investigation, Tener interviewed Foster, Capasso, and 18 of their co-workers and supervisors. Further, she considered Hillside Police Department's internal investigation. Tener concluded that Foster's claims were meritless. She found no witnesses to corroborate Foster's claims.[7] DeFilippo Affidavit Exh. D.

Foster alleges, however, that the defendants did not conduct a timely investigation. In particular, she asserts that defendants "dragged their feet" by allowing Tener to take seven months to complete her investigation. Plaintiff's Brief at 10–12; Foster Affidavit ¶¶ 40–41. This claim is meritless. On March 22, 1990 Foster pressed criminal charges against Capasso. DeSanto Affidavit ¶ 16, Exhs. CC and DD. He refused to speak with Tener while the charges were pending. DeFilippo Affidavit ¶ 6; Moseley Affidavit Exh. D. Tener could not force Capasso to speak with her because it would have violated his Fifth Amendment rights. Foster voluntarily withdrew those charges on September 4, 1990. Moseley Affidavit Exh. F. On that day, Tener sent Capasso's attorney a letter in order to schedule an interview with Capasso. Moseley Affidavit Exh. G; DeFilippo Affidavit Exh. D. She interviewed him on September 26 and issued her report on October 12, 1990.

■ Furthermore, Foster alleges that defendants failed to respond adequately to her charges because neither they nor Tener considered the results of her lie detector test. This challenge to the defendants' re-

---

**7.** Given the exhaustive investigations undertaken by defendants and the independent arbitrator in order to corroborate plaintiff's complaint, and given Capasso's denial of Foster's claims, defendants did not have to credit Foster's claims in order to avoid liability under Title VII.

sponse and to Tener's investigation fails. The accuracy of lie detector tests is highly questioned. *See Brown v. Darcy,* 783 F.2d 1389, 1395 (9th Cir.1986). In fact, due to their unreliability and inaccuracy, polygraph tests are not admissible in federal court to prove that the party who submitted to the polygraph told the truth.[8] Given the inaccuracy and unreliability of polygraph evidence, Tener's refusal to consider the polygraph does not prove that the defendants response was inappropriate.[9]

Additionally, Foster contends that the defendants did not engage in an adequate remedial response because they failed to adopt a sexual harassment policy until nine months after Foster reported that Capasso had sexually harassed her. Plaintiff's Brief at 29; Foster Affidavit ¶ 40. This assertion is simply a red herring. In *Vinson,* the Supreme Court noted that whether an employer has a sexual harassment policy in effect is a relevant factor to determine employer liability. The Supreme Court, however, did not conclude that in order to avoid liability an employer must have a sexual harassment policy in effect or must enact one. In fact, in *Vinson* the employer had a policy against discrimination, but had no sexual harassment policy. 477 U.S. at 71, 106 S.Ct. at 2408. *See also Spencer v. General Electric Co.,* 703 F.Supp. 466, 471 n. 13 (E.D.Va.1989) ("Title VII does not require defendant to maintain an anti-sexual harassment policy.").

Finally, plaintiff asserts that defendants' inaction created a hostile environment. Foster's supports her allegation solely with a statement in her affidavit that "[unnamed others] joke[d] about the situation." Plaintiff's Brief at 10; Foster Affidavit ¶ 36. This proof merely consists of conclusory allegations and thus does not suffice to rebut defendants showing that there are no material facts at issue concerning the remedial actions taken by them.

## C. *The Retaliation Claims*

■ Under Title VII an employer may be held liable if the employer retaliates against the employee because that employee has filed a claim with the EEOC against his or her employer. As in a disparate treatment claim, a plaintiff can prove retaliation by circumstantial evidence. Hence, the allocation of proof in a disparate treatment claim governs the allocation of proof in a retaliation claim. *See Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987); *Bennun v. Rutgers State University,* 737 F.Supp. 1393, 1399 (D.N.J.1990). Therefore, as in a disparate treatment claim, a "plaintiff must establish a prima facie case before the burden of production shifts to the defendant." *Id.* (citing *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.), *cert denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)).

■ Plaintiff establishes a prima facie case if he or she demonstrates:

(1) that he [or she] engaged in statutorily protected activity;

(2) that he [or she] suffered an adverse employment action; and

(3) that a causal link exists between the protected activity and the [adverse employment action].

*Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied, Avdel Corp. v. Jalil,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). Courts have noted that a plaintiff can demonstrate a causal connection between a protected activity and adverse employment action by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct followed by adverse action." *Burrus,* 683 F.2d at 343. Moreover, Title VII does not require that the underlying employment

---

8. An exception exists if before the polygraph is administered, both parties stipulate to allow it into evidence. *See Brown v. Darcy,* 783 F.2d 1389, 1395 (9th Cir.1986). *In the Matter of Daniels,* 118 N.J. 51, 570 A.2d 416 (1990); *New Jersey v. Reyes,* 237 N.J.Super. 250, 567 A.2d 287 (1989).

9. Further, in order to insure that the independent arbitrator was not influenced by the defendants, defendants could not dictate to Tener how to investigate her claim. For this reason, Foster's allegation that Tener should have forced both Foster and Capasso to undergo a psychological examination fails.

practice challenged by plaintiff actually violates Title VII. Rather, plaintiff solely needs "a reasonable belief that there is a title VII violation." *Collins v. Illinois*, 830 F.2d 692, 702 (7th Cir.1987).

After plaintiff establishes his or her prima facie case, the burden of production shifts to defendant to "articulate a legitimate non-discriminatory reason for the employment decision." *Yartzoff*, 809 F.2d at 1376; *Collins*, 830 F.2d 692 at 702. If defendant meets this burden, then the inference of discrimination arising from plaintiff's prima facie case drops out and plaintiff must demonstrate that the alleged non-discriminatory reason was merely pretextual. *See Jalil*, 873 F.2d at 708; *Yartzoff*, 809 F.2d at 1377.

In order to prevail on a motion for summary judgment in a retaliation claim, defendants can show that plaintiff has failed to establish his or her prima facie case. If plaintiff has established his or her prima facie case, defendants can prevail on a motion for summary judgment if they have offered a legitimate non-discriminatory reason for their actions and they have shown that "plaintiff could not raise a [genuine] issue of [material] fact regarding whether defendant's proffered explanation was pretextual." *Jalil*, 873 F.2d at 708.

Foster alleges that defendants retaliated against her in six separate instances. Her claims, however, cannot withstand defendants' motion for summary judgment. In some instances Foster's claims fail because she has not established her prima facie case. Even when Foster has met her prima facie burden, defendants have articulated a legitimate non-discriminatory reason for their actions. Foster tries to prove that the defendants allegations are pretextual solely through conclusory allegations. These allegations cannot withstand a motion for summary judgment.[10]

### 1. The May 14, 1990 Meeting

■ Foster alleges that DeSanto retaliated against her when he questioned her about the sexual harassment charge she filed with the EEOC. Specifically, Foster maintains that DeSanto stated she had made, "false and misleading statements to the EEOC and reminded [her] that [her] statements to the EEOC had been made under penalty of perjury." Further, according to Foster, "DeSanto said something to the effect of, 'are you trying to build a case against us.'" Plaintiff's Brief at 13–14; Foster Affidavit ¶¶ 46 and 47; DeSanto Affidavit Exh. KK.

Foster's claim fails to survive a summary judgment motion because Foster has failed to adequately allege a prima facie case. In particular, Foster has not shown any adverse employment action taken against her. *See Burrows v. Chemed Corporation*, 567 F.Supp. 978, 986–987 (E.D.Mo.1983), *aff'd*, 743 F.2d 612 (8th Cir.1984) (questioning employee about why he or she filed a complaint with the EEOC does not constitute an adverse employment action). In fact, employers should be allowed to inquire about charges brought against them by their employees without fear of a charge of retaliation. To rule otherwise would unduly restrict employers in the necessary exercise of their supervisory functions.

### 2. The Canceled Disciplinary Hearing

■ Foster further asserts that defendants retaliated against her in May 1990, when Shelbourne scheduled a disciplinary hearing. Shelbourne scheduled the hearing because Foster was seven minutes late on April 24, 1990 and one hour late on May 11, 1990. Foster Affidavit ¶ 49. Moreover, Foster alleges that Shelbourne asked her "to sign a waiver of a civil service requirement that no disciplinary hearing be held until two weeks after disciplinary charges are served." Finally, she states "that after her attorney spoke with [Hillside's] attorney, Shelbourne canceled the disciplinary hearing and never again asked her to sign a waiver." Foster Affidavit ¶ 51. Foster received a warning for her tardiness.

---

**10.** The fact that Foster's underlying sexual harassment claim is not actionable under Title VII does not moot her retaliation claims.

Defendants correctly assert that this retaliation claim is ripe for summary judgment for two reasons. First, Foster has not established her prima facie case. In particular because the meeting was canceled, she has not shown that defendants have taken any adverse action taken against her. *See Hale v. Marsh*, 808 F.2d 616, 619 (7th Cir.1986) (attempted retaliation not actionable under Title VII).

Second, even assuming that Foster has established her prima facie case, this Court still should grant defendants' motion for summary judgment. Defendants have provided a valid non-discriminatory reason for scheduling the disciplinary meeting. Foster received a memorandum from Shelbourne dated January 22, 1990, in which Shelbourne reprimanded Foster for her absenteeism and her tardiness. In particular, Shelbourne explicitly warned Foster that he would "expect that disciplinary action [will] be taken against you if you do not show improvement [regarding tardiness]." DeSanto Affidavit Exh. U. In accordance with the memo, defendants scheduled the disciplinary meeting due to her repeated tardiness. Foster has offered no evidence to show that the reason the defendants gave for scheduling the meeting, was merely a pretext for retaliatory behavior. Because Foster has not shown that there is a question of material fact as to the scheduling of the disciplinary meeting, this Court will grant defendants' motion for summary judgment as to that alleged retaliatory action.

### 3. The Disciplinary Warnings

■ Foster also maintains that defendants retaliated against her when they issued the disciplinary warnings to Foster for arriving seven minutes late on April 24, 1990, and one hour late on May 11, 1990. Plaintiff's Brief at 15; Foster Affidavit ¶ 52. Defendants again argue that they have articulated a non-discriminatory reason for the warning; Foster reported to work tardy. DeSanto Affidavit ¶¶ 19 and 20.

Foster replies that defendants have given a justification which is merely a pretext for retaliatory behavior. In particular, Foster alleges that "unnamed others" had not received warnings for similar violations. Foster Affidavit ¶ 52. These conclusory allegations cannot withstand a motion for summary judgment.

Moreover, she claims Shelbourne and DeSanto "admitted" that they treated "others" differently. According to Foster:

They did not deny that other dispatchers were not similarly treated and only stated to me that other dispatchers' relationships with their lieutenants are different and that my lieutenant's complaint about the seven minute lateness had precipitated the disciplinary warning against me.

Foster Affidavit ¶ 52.

Again Foster's assertions that Shelbourne and DeSanto admitted "other dispatchers" were treated differently are merely conclusory and cannot survive a motion for summary judgment. Moreover, according to Foster herself defendants never made an admission. Foster specifically stated that defendants never said that "others" were treated differently.

### 4. The Confirmatory Letter

■ Further, Foster claims that defendants retaliated against her when Shelbourne asked her to confirm a conversation that Foster had with Shelbourne. During that talk, Foster stated the reasons she dismissed the criminal complaints she had commenced against Capasso. Plaintiff's Brief at 16–17; Foster Affidavit ¶¶ 55 and 56.

Defendants reply that they did not retaliate against Foster. At the outset, defendants assert that Foster failed to file the retaliation claim with the EEOC within 180 days of the alleged retaliation. Hence, she is barred by the statute of limitations from bringing the claim. Defendants' Reply Brief at 14. Moreover, defendants prevail on their summary judgment claim because Foster has failed to establish her prima facie case. In particular, a confirmatory letter is not an adverse employment action. *See Rivers v. Baltimore Dept. of Recreation & Parks*, 51 FEP 1886, 1894, 1990 WL 112429 (D.Md.1990) (letter placed in person-

nel file which did not threaten plaintiff with any form of discipline did not constitute adverse employment action).

Even assuming that Foster has adequately met her prima facie case, Shelbourne asserts that he sent the letter for a legitimate non-discriminatory reason. Shelbourne declares that he had asked the Union Prosecutor's Office whether Foster's voluntary dismissal of the criminal charges against Capasso disposed of the case against Capasso. The Union Prosecutor's Office informed Shelbourne that the dismissal concluded the criminal action. Further, the Union Prosecutor's Office recommended that Shelbourne send a confirming letter to Foster. Foster has introduced no evidence to show that this reason is pretextual. Therefore, this Court will grant the motion for summary judgment as to this retaliation claim.

### 5. The Request for Disability Pay

■ Additionally, Foster maintains that DeFilippo retaliated against her when she "mishandled or ignored" Foster's request for paid disability. According to Foster, DeFilippo's actions caused Foster not to receive paid disability. Plaintiff's Brief at 15; Foster Affidavit ¶¶ 53 and 54.

Assuming that Foster has stated a prima facie case, defendants have shown a legitimate non-discriminatory reason for denying Foster's request for paid disability. Specifically, DeFilippo asserts that Foster did not receive disability pay because the claims representative for Hillside's workers compensation carrier "advised Hillside that Foster would not be eligible for disability leave." DeFilippo Affidavit ¶ 9. DeFilippo contends that Hillside refuses to pay for an employee's disability leave when the workers compensation carrier denies coverage for the employee. Otherwise, Hillside's spending would exceed its budgetary constraints. DeFilippo Reply Affidavit ¶¶ 5–7. Furthermore, she declares that Foster had used all of the time allocated to her when she requested disability leave with pay.

Janet Vlaisavljevic's reply affidavit confirms that DeFilippo correctly stated Hillside's policy. Based on a review of the Hillside Police Department's official records, Ms. Vlaisavljevic avers that during the past five years the Hillside Police Department "has not granted sick leave with pay to any employee after that employee has exhausted his or her accumulated sick days, vacation days, and personal days." Vlaisavljevic Affidavit ¶ 2. Further, she concludes that "in the past five years [Hillside] has not granted leave with pay to any employee for an injury that the employee claimed to be work related unless the representative of the worker's compensation carrier for [Hillside] first approved coverage." Vlaisavljevic Affidavit ¶ 3.

Again, Foster cannot withstand a summary judgment motion. Foster supports her position that the defendants' proffered reason was merely a pretext only with conclusory and vague allegations. In particular, Foster never shows the Court that DeFilippo refused to give her information. Moreover, Foster supplies no evidence to demonstrate how her claims were "ignored or mishandled." Furthermore, Foster merely alleges that "others" who were similarly situated received disability pay. Despite the fact she had access to Hillside's records regarding paid disability leave, Foster has not pointed to one similarly situated employee who was treated differently than she was.

### 6. Hillside's Refusal to Reinstate Foster

■ Finally, Foster seems to claim that the defendants retaliated against her when the Hillside Police Department refused to reinstate her after her psychiatrist deemed her fit for duty on December 31, 1990. Plaintiff's Brief at 21. Once more, even if Foster has adequately supported her prima facie case, defendants have shown a legitimate non-discriminatory reason for failing to reinstate Foster; both Hillside's psychiatrist and a neutral psychiatrist did not find Foster fit for duty.

Specifically, Hillside contends that its psychiatrist, Dr. Ferretti, could not opine about Foster's fitness without making any assumptions about the truthfulness of Foster's allegations against Capasso. Dr. Ferretti found that, if Foster was "reasonably

truthful and accurate in her narration then she could be reinstated ... despite some evidence of psychiatric symptomology." Dr. Ferretti also stated, however, "[that if Foster was not truthful then] my diagnosis, recommendations, and prognosis could be conceivably altered." Moseley Reply Affidavit Exhs. B and C.

Moreover, the neutral psychiatrist, Dr. Motley, concluded that Foster was not fit to return to her position as a civilian dispatcher. Significantly, in order to fully apprise himself about Foster, Dr. Motley requested that Foster submit to a battery of psychological tests and provide to him records of the psychiatrists who had previously treated her. She refused, however, to furnish the information. Moseley Reply Affidavit Exhs. B and C. Finally, Hillside alleges that Foster's own psychiatrist seems to equivocate about Foster's ability to return to her dispatcher position. Specifically in a letter to Foster's attorney, Foster's psychiatrist stated:

In December 1990 and in January 1991 I felt that her condition had improved to the extent that she could go back to work but only the notion of facing Sergeant Capasso or entering the same environment brought back all anxieties, fears and depression and Miss Foster has not yet returned to work.

Moseley Reply Affidavit Exh. D. Based on the reports of Drs. Ferretti and Motley, as well as Foster's psychiatrist's statement, Hillside contends that it would not reinstate Foster.

Foster has not produced any evidence to show that Hillside's reason is a pretext. During oral argument, Foster's attorney alleged that Hillside conspired with Dr. Ferretti to ensure that he would not find Foster fit for duty. Foster's counsel, however, offered no evidence of the alleged conspiracy. Therefore, this Court will grant defendants' motion for summary judgment as to this retaliation claim.

**D.  *The § 1983 Claims***

■ The *Andrews* court concisely summarized the plaintiff's burden under § 1983 for proving sexual discrimination in employment based on a denial of equal protection. According to the court:

plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.' Specifically to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon her gender.

895 F.2d at 1478.

■ Moreover, in order to establish individual liability for sexual discrimination under § 1983,[11] "there must be some affirmative conduct by the [individual] that played a role in the discrimination." *Id.* (citing *Rizzo v. Goode*, 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976)). A plaintiff can show this conduct, "through allegations of personal direction or of actual knowledge and acquiescence or through proof of direct discrimination by the [individual]." *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)).

The Third Circuit has held that purposeful discrimination can be proved through circumstantial or indirect evidence. *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 48 (3d Cir.1989). In particular, the Third Circuit has adopted the burden shifting standards applied in a Title VII case to an employment discrimination action brought under § 1983. *Lewis v. University of Pittsburgh*, 725 F.2d 910, 914–15 & n. 5 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984).

Additionally, courts have held that a plaintiff cannot bring a § 1983 action where the defendant only abridged rights created by Title VII. *See Day v. Wayne County Board of Auditors* 749 F.2d 1199,

---

**11.**  42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other per-

son within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

1204–05 (6th Cir.1984). Thus, courts have dismissed a plaintiff's § 1983 action when the plaintiff based his or her claim only on a violation of the retaliation provisions of Title VII. If a plaintiff also bases his or her claim on a separate ground, such as denial of equal protection, however, the § 1983 claim will stand. *Id.*

■ Furthermore, a public official is protected by qualified immunity from a suit under § 1983, if he or she can show that the "offending conduct did not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ Foster asserts that DeFilippo, Shelbourne and DeSanto (the "individual defendants"), are liable under § 1983 because they failed to investigate her claim of sexual harassment adequately and because they failed to institute a sexual harassment policy. Plaintiff's Brief at 41. In light of this Court's finding that the individual defendants properly responded to Foster's sexual harassment allegations, this claim fails.

■ Moreover, the individual defendants have properly asserted their qualified immunity defense. Plaintiff correctly states that the *Andrews* Court recognized that "the right to be free of discrimination based upon sex in the work place was well grounded in law and widely known to the public by 1986." Foster, however, argues that the individual defendants denied her equal protection because they failed to respond adequately to her sexual harassment claim. Because the courts have not yet "clearly established" the proper response required under the constitution, to a sexual harassment claim, the individual defendants raised the defense of qualified immunity properly. *See Poe v. Haydon,* 853 F.2d 418, 427 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989).

Additionally, Foster asserts that the individual defendants violated § 1983 by retaliating against her for filing her EEOC complaint. At the outset it seems that Foster bases her § 1983 action only on the individual defendants violating the anti-retaliation provisions of Title VII. Foster has never alleged how defendant's retaliation violated her 14th Amendment rights. Thus, these § 1983 claims fail.

■ Moreover, even if Foster alleges that the individual defendants retaliated against her based upon her gender and thus violated her rights under the Fourteenth Amendment, Foster's claim cannot withstand the instant motion. Specifically, Foster has failed to show that the individual defendants purposefully discriminated against her. The Third Circuit has adopted Title VII's burden shifting standards in order to show purposeful discrimination. As discussed above, however, under the Title VII framework, Foster's retaliation claims cannot survive a motion for summary judgment. Therefore, this Court will grant the individual defendants summary judgment as to Foster's § 1983 claims.

■ Foster also alleges that the Hillside Police Department and Hillside violated § 1983. Municipal liability may not be based on a theory of *respondeat superior. City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Instead, a plaintiff must "demonstrate that the municipality itself, through the implementation of a municipal policy or custom, cause[d] a constitutional violation." *Colburn v. Upper Darby Township,* 946 F.2d 1017, 1027 (3d Cir. 1991) (*citing Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 691–695, 98 S.Ct. 2018, 2036–2038, 56 L.Ed.2d 611 (1978)). Government policy consists of "an official proclamation, policy or edict" issued by a "decision maker possess[ing] final authority to establish policy with respect to the [subject matter in issue]." *Andrews,* 895 F.2d at 1480. Government "custom" consists of practices that, although not expressly authorized by law are "so permanent and well settled as to virtually constitute law." *Id.*

■ In either case, "it is incumbent upon a plaintiff to show that a policymaker

is responsible either for the policy or, through acquiescence, for the custom." *Id.* The question of who is a policymaker is one of state law. *Id.* at 1481. The Court must determine, based on state law, "which official has final unreviewable discretion to make a decision or take an action." *Id.* "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).

Foster's § 1983 claims against Hillside and the Hillside Police Department can be dismissed easily. This Court has granted the individual defendants summary judgment as to the § 1983 claims. Thus, even if under state law any of the individual defendants were policymakers, municipal liability under § 1983 could not exist. As the Third Circuit stated:

> [I]t is impossible on the delivery of a kick to inculpate the head and find no fault with the foot. This is exactly the course the jury took when they found the City liable and exculpated Tucker, a policymaker.

Similarly, this Court cannot impose liability under § 1983 upon either the Hillside Police Department or Hillside.[12]

**E. *The Court's Refusal to Exercise Pendent Jurisdiction***

■ The Supreme Court held in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), that a court can, in its discretion, exercise pendent jurisdiction over state law claim where, "the state and federal claims derive from a common nucleus of operative facts." The Court further stated "if the federal claims are dismissed before trial even though not insubstantial in a jurisdic-

tional sense, the state claims should be dismissed as well." 383 U.S. at 726, 86 S.Ct. at 1139.

Similarly, the Third Circuit has held that absent "exceptional circumstances," a court should not exercise pendent jurisdiction when there is "no substantial federal claim to which the state claims could be appended." *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir.1976). The *Tully* court held that the time expended in trying the case before the district court and appealing the case to the Third Circuit did not constitute exceptional circumstances. *Id.*

■ Because this Court has granted defendants summary judgment as to all their federal law claims, only plaintiff's state law claims remain. Hence, in accordance with *United Mine Workers* and *Tully,* this Court will not exercise pendent jurisdiction over plaintiff's state law claims. Therefore, this Court will dismiss plaintiff's state law claims without prejudice.[13]

## III. CONCLUSION

For the reasons discussed above, this Court will grant defendants' motion for summary judgment as to their federal claims. Because this Court will dismiss all federal claims, this Court will not exercise pendent jurisdiction over plaintiff's state law claims. Therefore, this Court will dismiss plaintiff's state law claims without prejudice.

---

12. Foster's direct claim under the 14th Amendment fails because it is based upon the same allegations as her § 1983 claim. *See Rogin v. Bensalem Township,* 616 F.2d 680, 686–87 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981).

13. The Court notes that the New Jersey Supreme Court has not yet addressed whether the statute of limitations for bringing a claim under the New Jersey Law Against Discrimination ("N.J. LAD") should be two years or six years. *See Carrington v. RCA Communications, Inc.,* 762 F.Supp. 632 (D.N.J.1991); *White v. Johnson & Johnson Products, Inc.,* 712 F.Supp. 33 (D.N.J. 1989).